# IMMIGRATION AND NATURALIZATION
# SERVICE *v.* STEVIC

No. 82–973.  Argued December 6, 1983—Decided June 5, 1984

408

*Deputy Solicitor General Geller* argued the cause for petitioner.   With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath,* and *Barbara E. Etkind.*

*Ann L. Ritter* argued the cause and filed a brief for respondent.*

JUSTICE STEVENS delivered the opinion of the Court.

For over 30 years the Attorney General has possessed statutory authority to withhold the deportation of an alien upon a finding that the alien would be subject to persecution in the country to which he would be deported. The question presented by this case is whether a deportable alien must demonstrate a clear probability of persecution in order to obtain such relief under § 243(h) of the Immigration and Nationality Act of 1952, 8 U. S. C. § 1253(h), as amended by § 203(e) of the Refugee Act of 1980, Pub. L. 96–212, 94 Stat. 107.

## I

Respondent, a Yugloslavian citizen, entered the United States in 1976 to visit his sister, then a permanent resident alien residing in Chicago. Petitioner, the Immigration and Naturalization Service (INS), instituted deportation proceedings against respondent when he overstayed his 6-week period of admission. Respondent admitted that he was deportable and agreed to depart voluntarily by February 1977. In January 1977, however, respondent married a United States citizen who obtained approval of a visa petition on his behalf. Shortly thereafter, respondent's wife died in an automobile accident. The approval of respondent's visa petition was

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Burt Neuborne, E. Richard Larson,* and *David Carliner;* for the American Immigration Lawyers Association by *Theodore Ruthizer;* for the American Jewish Committee et al. by *Samuel Rabinove;* for Amnesty International USA by *Paul L. Hoffman;* for the Committee on Migration and Refugee Affairs of the American Council of Voluntary Agencies for Foreign Service et al. by *William T. Lake;* for the Lawyers Committee for International Human Rights by *Arthur C. Helton;* for the National Immigration Project of the National Lawyers Guild, Inc., by *Donald L. Ungar;* and for the United Nations High Commissioner for Refugees by *David B. Robinson.*

automatically revoked, and petitioner ordered respondent to surrender for deportation to Yugolslavia.

Respondent moved to reopen the deportation proceedings in August 1977, seeking relief under § 243(h) of the Immigration and Naturalization Act, which then provided:

"The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason." 8 U. S. C. § 1253(h) (1976 ed.).

Respondent's supporting affidavit stated that he had become active in an anti-Communist organization after his marriage in early 1977, that his father-in-law had been imprisoned in Yugoslavia because of membership in that organization, and that he feared imprisonment upon his return to Yugoslavia.

In October 1979, the Immigration Judge denied respondent's motion to reopen without conducting an evidentiary hearing.[1] The Board of Immigration Appeals (BIA) upheld that action, explaining:

"A Motion to reopen based on a section 243 (h) claim of persecution must contain prima facie evidence that there is a clear probability of persecution to be directed at the individual respondent. See *Cheng Kai Fu* v. *INS*, 386 F. 2d 750 (2 Cir. 1967), cert. denied, 390 U. S. 1003 (1968). Although the applicant here claims to be eligible for withholding of deportation which was not available to him at the time of his deportation hearing, he has not

---

[1] The Immigration Judge's decision stated:

"The policy of restricting favorable exercise of discretion to cases of *clear probability of persecution of the particular individual has been sanctioned by the courts (Lena* v. *Immigration and Naturalization Service.* 379 F 2nd 536[,] 538 (7th Cir. 1967). The respondent has submitted no substantial evidence that he would be subjected to persecution as that term is defined by the court." Brief for Respondent 6–7.

presented any evidence which would indicate that he will be singled out for persecution." App. to Pet. for Cert. 34–35.

Respondent did not seek judicial review of that decision.

After receiving notice to surrender for deportation in February 1981, respondent filed his second motion to reopen.[2] He again sought relief pursuant to § 243(h) which then— because of its amendment in 1980—read as follows:

"The Attorney General shall not deport or return any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U. S. C. § 1253(h)(1).

Although additional written material was submitted in support of the second motion, like the first, it was denied without a hearing. The Board of Immigration Appeals held that respondent had not shown that the additional evidence was unavailable at the time his first motion had been filed and, further, that he had still failed to submit prima facie evidence that "there is a clear probability of persecution" directed at respondent individually.[3] Thus, the Board applied the same

---

[2] He did not voluntarily respond to that notice; moreover, after his apprehension, he unsuccessfully tried to escape from custody. These events gave rise to a habeas corpus petition raising separate issues that are not before us now.

[3] The opinion of the BIA stated, in part:

"Accordingly, we find that the respondent has failed to comply with the provisions of 8 CFR 3.2 in that there has been no showing that the submitted material was not available nor could not have been discovered or presented at a former hearing.

"In addition, we also conclude that the respondent has failed to make out a prima facie showing that he will be singled out for persecution if deported to Yugoslavia. A motion to reopen based on a section 243(h) claim of persecution must contain prima facie evidence that there is a clear probability of persecution to be directed at the individual respondent. See *Cheng Kai*

standard of proof it had applied regarding respondent's first motion to reopen, notwithstanding the intervening amendment of § 243(h) in 1980.

The United States Court of Appeals for the Second Circuit reversed and remanded for a plenary hearing under a different standard of proof. *Stevic* v. *Sava*, 678 F. 2d 401 (1982). Specifically, it held that respondent no longer had the burden of showing "a clear probability of persecution," but instead could avoid deportation by demonstrating a "well-founded fear of persecution." The latter language is contained in a definition of the term "refugee" adopted by a United Nations Protocol to which the United States has adhered since 1968. The Court of Appeals held that the Refugee Act of 1980 changed the standard of proof that an alien must satisfy to obtain relief under § 243(h), concluding that Congress intended to abandon the "clear probability of persecution" standard and substitute the "well-founded fear of persecution" language of the Protocol as the standard. Other than stating that the Protocol language was "considerably more generous" or "somewhat more generous" to the alien than the former standard, *id.*, at 405, 406, the court did not detail the

*Fu* v. *INS*, 386 F. 2d 750 (2 Cir. 1967), cert. denied, 390 U. S. 1003 (1968); *Matter of McMullen*, Interim Decision 2831 (BIA 1981).

"In the instant case, the many journalistic articles submitted by the respondent are of a general nature, referring to political conditions in Yugoslavia, but not specifically relating to the respondent. The affidavits and petitions contained in the file, while they conclude that the respondent will be imprisoned if he returns to Yugoslavia, do not contain any supporting facts. They express an opinion but provide no direct evidence to link the respondent's activities in this country and the probability of his persecution in Yugoslavia.

"With regard to the respondent's allegation that he will be persecuted by Albanian ethnics in Gnjilane, we find that there is nothing to stop the respondent from going to another town in Yugoslavia should he feel threatened in his hometown. A respondent is deported to country *[sic]*, not a city or province. *Lavdas* v. *Holland*, 235 F. 2d 955 (3 Cir. 1956); *Cantisani* v. *Holton*, 248 F. 2d 737 (7 Cir. 1957)." App. to Pet. for Cert. 30a–31a.

differences between them and stated that it "would be unwise to attempt a more detailed elaboration of the applicable legal test under the Protocol," *id.*, at 409. The court concluded that respondent's showing entitled him to a hearing under the new standard.

Because of the importance of the question presented, and because of the conflict in the Circuits on the question,[4] we granted certiorari, 460 U. S. 1010 (1983). We now reverse and hold that an alien must establish a clear probability of persecution to avoid deportation under § 243(h).

## II

The basic contentions of the parties in this case may be summarized briefly. Petitioner contends that the words "clear probability of persecution" and "well-founded fear of persecution" are not self-explanatory and when read in the light of their usage by courts prior to adoption of the Refugee Act of 1980, it is obvious that there is no "significant" difference between them. If there is a "significant" difference between them, however, petitioner argues that Congress' clear intent in enacting the Refugee Act of 1980 was to maintain the status quo, which petitioner argues would mean continued application of the clear-probability-of-persecution standard to withholding of deportation claims. In this regard, petitioner maintains that our accession to the United Nations Protocol in 1968 was based on the express "understanding" that it would not alter the "substance" of our immigration laws.

Respondent argues that the standards are not coterminous and that the well-founded-fear-of-persecution standard turns almost entirely on the alien's state of mind. Respondent points out that the well-founded-fear language was adopted in the definition of a refugee contained in the United Nations Protocol adhered to by the United States since 1968. Re-

---

[4] Compare *Rejaie* v. *INS*, 691 F. 2d 139 (CA3 1982), with *Reyes* v. *INS*, 693 F. 2d 597 (CA6 1982) (relying on decision under review).

spondent basically contends that ever since 1968, the well-founded-fear standard should have applied to withholding of deportation claims, but Congress simply failed to honor the Protocol by failing to enact implementing legislation until adoption of the Refugee Act of 1980, which contains the Protocol definition of refugee.

Each party is plainly correct in one regard: in 1980 Congress intended to adopt a standard for withholding of deportation claims by reference to pre-existing sources of law. We begin our analysis of this case by examining those sources of law.

### III

*United States Refugee Law prior to 1968*

Legislation enacted by the Congress in 1950,[5] 1952,[6] and 1965[7] authorized the Attorney General to withhold deportation of an otherwise deportable alien if the alien would be subject to persecution upon deportation. At least before 1968, it was clear that an alien was required to demonstrate a "clear probability of persecution" or a "likelihood of persecution" in order to be eligible for withholding of deporta-

---

[5] Section 23 of the Subversive Activities Control Act of 1950 amended § 20 of the Immigration Act of February 5, 1917, to rewrite the deportation provisions and specifically to add a new § 20(a) which provided in part as follows:

"No alien shall be deported under any provisions of this Act to any country in which the Attorney General shall find that such alien would be subjected to physical persecution." 64 Stat. 1010.

[6] Section 243(h) of the Immigration and Nationality Act of 1952 provided as follows:

"The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason." 66 Stat. 214.

[7] That amendment read as follows:

"(f) Section 243(h) is amended by striking out 'physical persecution' and inserting in lieu thereof 'persecution on account of race, religion, or political opinion.'" §10, 79 Stat. 918.

The provision as revised in 1965 is quoted in the text, *supra*, at 410.

tion under § 243(h) of the Immigration and Nationality Act of 1952, 8 U. S. C. § 1253(h) (1964 ed.).  *E. g., Cheng Kai Fu* v. *INS,* 386 F. 2d 750, 753 (CA2 1967), cert. denied, 390 U. S. 1003 (1968); *Lena* v. *INS,* 379 F. 2d 536, 538 (CA7 1967); *In re Janus and Janek,* 12 I. & N. Dec. 866, 873 (BIA 1968); *In re Kojoory,* 12 I. & N. Dec. 215, 220 (BIA 1967). With certain exceptions, this relief was available to any alien who was already "within the United States," albeit unlawfully and subject to deportation.

The relief authorized by § 243(h) was not, however, available to aliens at the border seeking refuge in the United States due to persecution.   See generally *Leng May Ma* v. *Barber,* 357 U. S. 185 (1958).   Since 1947, relief to refugees at our borders has taken the form of an

> "immigration and naturalization policy which granted immigration preferences to 'displaced persons,' 'refugees,' or persons who fled certain areas of the world because of 'persecution or fear of persecution on account of race, religion, or political opinion.'   Although the language through which Congress has implemented this policy since 1947 has changed slightly from time to time, the basic policy has remained constant—to provide a haven for homeless refugees and to fulfill American responsibilities in connection with the International Refugee Organization of the United Nations."   *Rosenberg* v. *Yee Chien Woo,* 402 U. S. 49, 52 (1971).

Most significantly, the Attorney General was authorized under § 203(a)(7) of the Immigration and Nationality Act of 1952, 8 U. S. C. § 1153(a)(7)(A)(i) (1976 ed.), to permit "conditional entry" as immigrants for a number of refugees fleeing from a Communist-dominated area or the Middle East "because of persecution or fear of persecution on account of race, religion, or political opinion."   See also § 212(d)(5) of the Act, 8 U. S. C. § 1182(d)(5) (granting Attorney General discretion to "parole" aliens into the United States tempo-

rarily for emergency reasons). An alien seeking admission under § 203(a)(7) was required to establish a good reason to fear persecution. Compare *In re Tan*, 12 I. & N. Dec. 564, 569–570 (BIA 1967), with *In re Ugricic*, 14 I. & N. Dec. 384, 385–386 (Dist. Dir. 1972).[8]

### The United Nations Protocol

In 1968 the United States acceded to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U. S. T. 6223, T. I. A. S. No. 6577. The Protocol bound parties to comply with the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees, 189 U. N. T. S. 150 (July 28, 1951)[9] with respect to "refugees" as defined in Article 1.2 of the Protocol.

Article 1.2 of the Protocol defines a "refugee" as an individual who

> "owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear, is unwilling to return to it."

Compare 19 U. S. T. 6225 with 19 U. S. T. 6261 (1968).

Two of the substantive provisions of the Convention are germane to the issue before us. Article 33.1 of the Conven-

---

[8] Notably, during this period of time, neither immigration judges nor the Board of Immigration Appeals had jurisdiction over asylum claims under § 203(a)(7). While the Board had jurisdiction over § 243(h) requests for withholding of deportation, § 203(a)(7) claims for asylum rested in the jurisdiction of Immigration and Naturalization Service District Directors. See generally *In re Lam*, Interim Dec. No. 2857, p. 5, n. 4 (BIA, Mar. 24, 1981).

[9] The United States is not a signatory to the Convention itself.

tion provides: "No Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 19 U. S. T., at 6276. Article 34 provides in pertinent part: "The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees. . . ." *Ibid.*[10]

The President and the Senate believed that the Protocol was largely consistent with existing law. There are many statements to that effect in the legislative history of the accession to the Protocol. *E. g.*, S. Exec. Rep. No. 14, 90th Cong., 2d Sess., 4 (1968) ("refugees in the United States have long enjoyed the protection and the rights which the protocol calls for"); *id.*, at 6, 7 ("the United States already meets the standards of the Protocol"); see also, *id.*, at 2; S. Exec. K, 90th Cong., 2d Sess., III, VII (1968); 114 Cong. Rec. 29391 (1968) (remarks of Sen. Mansfield); *id.*, at 27757 (remarks of Sen. Proxmire). And it was "absolutely clear" that the Protocol would not "requir[e] the United States to admit new categories or numbers of aliens." S. Exec. Rep. No. 14, *supra*, at 19. It was also believed that apparent differences

---

[10] Article 32.1 of the Convention provides: "The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order." 19 U. S. T., at 6275. It seems plain that respondent could not invoke Article 32, since he was not lawfully in the country when he overstayed his period of admission. United Nations Economic and Social Council, Report of Ad Hoc Committee on Statelessness and Related Problems 47 (Mar. 2, 1950) (U. N. Doc. E/1618/Corr.1; E/AC.32/5/Corr.1) ("The expression 'lawfully within their territory' throughout this draft Convention would exclude a refugee who while lawfully admitted has overstayed the period for which he was admitted or was authorized to stay or who has violated any other condition attached to his admission or stay"); see also United Nations Economic and Social Council, Report of Ad Hoc Committee on Statelessness and Related Problems, Second Session 11, ¶20 (Aug. 25, 1950) (U. N. Doc. E/1850; E/AC.32/8). Accord, *In re Dunar*, 14 I. & N. Dec. 310, 315–318 (BIA 1973) (citing additional authority).

between the Protocol and existing statutory law could be reconciled by the Attorney General in administration and did not require any modification of statutory language. See, *e. g.,* S. Exec. K, *supra,* at VIII.

*United States Refugee Law: 1968–1980*

Five years after the United States' accession to the Protocol, the Board of Immigration Appeals was confronted with the same basic issue confronting us today in the case of *In re Dunar,* 14 I. & N. Dec. 310 (1973). The deportee argued that he was entitled to withholding of deportation upon a showing of a well-founded fear of persecution, and essentially maintained that a conjectural possibility of persecution would suffice to make the fear "well founded." The Board rejected that interpretation of "well founded," and stated that a likelihood of persecution was required for the fear to be "well founded." *Id.,* at 319. It observed that neither § 243(h) nor Article 33 used the term "well-founded fear," and stated:

> "Article 33 speaks in terms of threat to life or freedom on account of any of the five enumerated reasons. Such threats would also constitute subjection to persecution within the purview of section 243(h). The latter has also been construed to encompass economic sanctions sufficiently harsh to constitute a threat to life or freedom, *Dunat* v. *Hurney,* 297 F. 2d 744 (3 Cir., 1962); cf. *Kovac* v. *INS,* 407 F. 2d 102 (9 Cir., 1969). In our estimation, there is no substantial difference in coverage of section 243(h) and Article 33. We are satisfied that distinctions in terminology can be reconciled on a case-by-case consideration as they arise." *Id.,* at 320.

The Board concluded that "Article 33 has effected no substantial changes in the application of section 243(h), either by way of burden of proof, coverage, or manner of arriving at

decisions," *id.*, at 323,[11] and stated that Dunar had failed to establish "the likelihood that he would be persecuted . . . . Even if we apply the nomenclature of Articles 1 and 33, we are satisfied that respondent has failed to show a well-founded fear that his life or freedom will be threatened," *id.*, at 324.

Although before *In re Dunar*, the Board and the courts had consistently used a clear-probability or likelihood standard under §243(h), after that case the term "well-founded fear" was employed in some cases.[12] The Court of Appeals for the Seventh Circuit, which had construed §243(h) as ap-

---

[11] The Board observed that the Attorney General had consistently granted withholding under § 243(h) when the required showing was made. *Id.*, at 321–322.

[12] See, *e. g.*, *Fleurinor* v. *INS*, 585 F. 2d 129, 132–134 (CA5 1978) ("well-founded fear" used by Immigration Judge; "likelihood" and "probable persecution" used by court); *Martineau* v. *INS*, 556 F. 2d 306, 307, and n. 2 (CA5 1977) ("'clear probability' of persecution" and "likelihood of persecution"); *Henry* v. *INS*, 552 F. 2d 130, 131–132 (CA5 1977) ("probable persecution," "reason to fear persecution" and "well-grounded fear of political persecution"); *Pereira-Diaz* v. *INS*, 551 F. 2d 1149, 1154 (CA9 1977) ("well-founded fear"); *Coriolan* v. *INS*, 559 F. 2d 993, 997, and n. 8 (CA5 1977) ("well-founded fear that . . . lives or freedom will be threatened" used by Board); *Zamora* v. *INS*, 534 F. 2d 1055, 1058 (CA2 1976) ("likelihood of persecution" used by court, "well-founded fear" used by Board); *Daniel* v. *INS*, 528 F. 2d 1278, 1279 (CA5 1976) ("probability of persecution"); *Paul* v. *INS*, 521 F. 2d 194, 200, and n. 11 (CA5 1975) ("well-founded fear of political persecution"); *Gena* v. *INS*, 424 F. 2d 227, 232 (CA5 1970) ("likely to be persecuted"); *Kovac* v. *INS*, 407 F. 2d 102, 105, 107 (CA9 1969) ("probability of persecution" and "likelihood"); *In re Williams*, 16 I. & N. Dec. 697, 700–702, 704 (BIA 1979) ("well-founded fear," "'probable persecution'" and "likelihood of persecution"); *In re Francois*, 15 I. & N. Dec. 534, 539 (BIA 1975) ("well-founded fear that . . . life or freedom will be threatened"); *In re Mladineo*, 14 I. & N. Dec. 591, 592 (BIA 1974) ("well-founded . . . fear of persecution"); *In re Maccaud*, 14 I. & N. Dec. 429, 434 (BIA 1973) ("reasonable fear" and "well-founded fear"); *In re Bohmwald*, 14 I. & N. Dec. 408, 409 (BIA 1973) ("well-founded fear of persecution").

plying only to "cases of clear probability of persecution" in a frequently cited case decided before 1968, *Lena* v. *INS,* 379 F. 2d 536, 538 (1967), reached the same conclusion in a case decided after the United States' adherence to the Protocol. *Kashani* v. *INS,* 547 F. 2d 376 (1977). In that opinion Judge Swygert reasoned that the "well founded fear of persecution" language could "only be satisfied by objective evidence," and that it would "in practice converge" with the "clear probability" standard that the Seventh Circuit had previously "engrafted onto [§]243(h)." *Id.,* at 379. Other Courts of Appeals appeared to reach essentially the same conclusion. See *e. g., Fleurinor* v. *INS,* 585 F. 2d 129, 132, 134 (CA5 1978); *Pereira-Diaz* v. *INS,* 551 F. 2d 1149, 1154 (CA9 1977); *Zamora* v. *INS,* 534 F. 2d 1055, 1058, 1063 (CA2 1976).

While the Protocol was the source of some controversy with respect to the standard for § 243(h) claims for withholding of deportation, the United States' accession did not appear to raise any questions concerning the standard to be applied for § 203(a)(7) requests for admission. The "good reason to fear persecution" language was employed in such cases. See, *e. g., In re Ugricic,* 14 I. & N. Dec., at 385–386.[13]

---

[13] The ideological and geographic restrictions of § 203(a)(7) itself were not altered after the United States' accession to the Protocol. The Attorney General continued during this period to use his authority under § 212(d) to parole refugees into the United States. Moreover, in 1974, the Attorney General, acting pursuant to his general authority under 8 U. S. C. § 1103, published regulations permitting applications for asylum to be made to an INS District Director or American consul. 8 CFR § 108.1 (1976). The regulations did not explicitly adopt a standard for the exercise of discretion on the application, but did provide that a denial of an asylum application "shall not preclude the alien, in a subsequent expulsion hearing, from applying for the benefits of section 243(h) of the Act and of Articles 32 and 33 of the Convention Relating to the Status of Refugees." 8 CFR § 108.2 (1976).

In 1979, these regulations were amended to provide that a request for asylum made by an alien after commencement of deportation proceedings, or after completion of deportation proceedings, would be considered as a request for withholding or a request to reopen, respectively, "under sec-

## IV

Section 203(e) of the Refugee Act of 1980 amended the language of § 243(h), basically conforming it to the language of Article 33 of the United Nations Protocol.[14] The amendment made three changes in the text of § 243(h), but none of these three changes expressly governs the standard of proof an applicant must satisfy or implicitly changes that standard.[15] The amended § 243(h), like Article 33, makes no mention of a probability of persecution or a well-founded fear of persecution. In short, the text of the statute simply does not specify

---

tion 243(h) of the Act and for the benefits of Articles 32 and 33 of the Convention Relating to the Status of Refugees." 8 CFR §§ 108.3(a) and (b) (1980). This amendment had the effect of conferring jurisdiction over asylum requests on the Board for the first time. See *In re Lam,* Interim Dec. No. 2857, p. 5, n. 4 (BIA, Mar. 24, 1981). While rejection of an asylum request by an INS District Director or American consul still did not "preclude the alien, in a subsequent expulsion hearing, from applying for the benefits of section 243(h) of the Act and of Articles 32 and 33 of the Convention Relating to the Status of Refugees," 8 CFR § 108.2 (1980), it appears that requests for asylum were to be judged by the same likelihood-of-persecution standard applicable to § 243(h) claims. Compare § 108.1 with § 108.3(a), § 108.3(b), and § 242.17(c).

[14] Compare *supra,* at 411, with *supra,* at 416–417.

[15] The amendment (1) substituted mandatory language for what was previously a grant of discretionary authority to the Attorney General to withhold deportation after making the required finding; (2) substituted a requirement that the Attorney General determine that the "alien's life or freedom would be threatened" for the previous requirement that the alien "would be subject to persecution," and (3) broadened the relevant causes of persecution from reasons "of race, religion or political opinion" to encompass "nationality" and "membership in a particular social group" as well.

The removal of the Attorney General's discretion to withhold deportation after persecution was established with the requisite degree of certainty relates to the consequences of meeting the standard, and not to the standard itself.

While it might be argued that the second and third changes in the text altered the substantive grounds one needs to establish to be entitled to withholding of deportation, contra, *infra,* at 425–428, neither indicates any diminution in the degree of certainty with which those grounds must be established.

how great a possibility of persecution must exist to qualify the alien for withholding of deportation. To the extent such a standard can be inferred from the bare language of the provision, it appears that a likelihood of persecution is required.[16] The section literally provides for withholding of deportation only if the alien's life or freedom "would" be threatened in the country to which he would be deported; it does not require withholding if the alien "might" or "could" be subject to persecution. Finally, § 243(h), both prior to and after amendment, makes no mention of the term "refugee"; rather, any alien within the United States is entitled to withholding if he meets the standard set forth.

Respondent understandably does not rely upon the specific textual changes in § 243(h) in support of his position that a well-founded fear of persecution entitles him to withholding of deportation. Instead, respondent points to the provision of the Refugee Act which eliminated the ideological and geographical restrictions on admission of refugees under § 203(a)(7) and adopted an expanded version of the United Nations Protocol definition of "refugee." This definition contains the well-founded-fear language and now appears under § 101(a)(42)(A) of the Immigration and Nationality Act, 8 U. S. C. § 1101(a)(42)(A). Other provisions of the Immigration and Nationality Act, as amended, now provide preferential immigration status, within numerical limits, to those qualifying as refugees under the modified Protocol definition[17] and renders a more limited class of refugees, though

---

[16] Notwithstanding the amendment of § 243(h), the regulation governing withholding of deportation claims remains substantively the same: in order to be entitled to a withholding of deportation, the alien "has the burden of satisfying the special inquiry officer that he would be subject to persecution . . . ," 8 CFR § 242.17(c) (1983), and the Board of Immigration Appeals, of course, continues to apply a clear-probability or likelihood-of-persecution standard with respect to such claims, as it did in this case.

[17] Under an amended § 207, the Attorney General may, within numerical limits, permit aliens who are overseas to immigrate into the United States

still a class broader than the Protocol definition, eligible for a discretionary grant of asylum.[18]

Respondent, however, is not seeking discretionary relief under these provisions, which explicitly employ the well-founded-fear standard now appearing in § 101(a)(42)(A). Rather, he claims he is entitled to withholding of deportation under § 243(h) upon establishing a well-founded fear of persecution. Section 243(h), however, does *not* refer to § 101(a)(42)(A). Hence, there is no textual basis in the statute for concluding that the well-founded-fear-of-persecution

on the ground of their status as refugees under § 101(a)(42). 8 U. S. C. § 1157. Refugees admitted under § 207, after one year of residence and successful reinspection, attain permanent resident alien status under § 209 of the amended Act. 8 U. S. C. § 1159.

[18] A new § 208(a) directed the Attorney General to establish procedures permitting aliens either in the United States or at our borders to apply for "asylum." 8 U. S. C. § 1158(a). Under § 208(a), in order to be eligible for asylum, an alien must meet the definition of "refugee" contained in § 101(a)(42)(A), a standard that also would qualify an alien seeking to immigrate under § 207. Meeting the definition of "refugee," however, does *not* entitle the alien to asylum—the decision to grant a particular application rests in the discretion of the Attorney General under § 208(a).

After passage of the Refugee Act, regulations relating to asylum previously contained in 8 CFR § 108 were repealed, and regulations were promulgated under the new § 208 of the Act. Those regulations, like the statute, expressly provide that a "well-founded fear of persecution" renders an alien eligible for a discretionary grant of asylum under § 208. 8 CFR § 208.5 (1983).

We note that when such asylum requests are made after the institution of deportation proceedings, they "shall *also* be considered as requests" under § 243(h). 8 CFR § 208.3(b) (1983) (emphasis supplied). This does not mean that the well-founded-fear standard is applicable to § 243(h) claims. Section 208.3(b) simply does not speak to the burden of proof issue; rather, it merely eliminates the need for filing a separate request for § 243(h) relief if a § 208 claim has been made. We further note that a § 243(h) request is not automatically also considered as a § 208 request under the regulations. Indeed, the alien may be barred from asserting a § 208 claim while still allowed to invoke § 243(h). See 8 CFR § 208.11 (1983).

standard is relevant to a withholding of deportation claim under § 243(h).

Before examining the legislative history of the Refugee Act of 1980 in order to ascertain whether Congress nevertheless intended a well-founded-fear standard to be employed under § 243(h), we observe that the Refugee Act itself does not contain any definition of the "well-founded fear of persecution" language contained in § 101(a)(42)(A). The parties vigorously contest whether the well-founded-fear standard is coterminous with the clear-probability-of-persecution standard.

Initially, we do not think there is any serious dispute regarding the meaning of the clear-probability standard under the § 243(h) case law.[19] The question under that standard is whether it is more likely than not that the alien would be subject to persecution. The argument of the parties on this point is whether the well-founded-fear standard is the same as the clear-probability standard as just defined, or whether it is more generous to the alien.

Petitioner argues that persecution must be more likely than not for a fear of persecution to be considered "well founded." The positions of respondent and several *amici curiae* are somewhat amorphous. Respondent seems to maintain that a fear of persecution is "well founded" if the evidence establishes some objective basis in reality for the fear. This would appear to mean that so long as the fear is not imaginary—*i. e.*, if it is founded in reality at all—it is "well founded." A more moderate position is that so long as an objective situation is established by the evidence, it need not be

---

[19] The term "clear probability" was used interchangeably with "likelihood"; the use of the word "clear" appears to have been surplusage. We think there is no merit to the suggestion that the Board was applying a "clear and convincing" standard to the persecution issue. See generally *Addington* v. *Texas*, 441 U. S. 418, 423–425 (1979). The Board is, of course, quite familiar with the clear-and-convincing standard, since the Government is held to that standard in deportation proceedings. *Woodby* v. *INS*, 385 U. S. 276 (1966).

shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility.

Petitioner and respondent seem to agree that prior to passage of the Refugee Act, the Board and the courts actually used a clear-probability standard for § 243(h) claims. That is, prior to the amendment, § 243(h) relief would be granted if the evidence established that it was more likely than not that the alien would be persecuted in the country to which he was being deported; relief would not be granted merely upon a showing of some basis in reality for the fear, or if there was only a reasonable possibility of persecution falling short of a probability. Petitioner argues that some of the prior case law using the term "well-founded fear" simply used that term interchangeably with the phrase "clear probability." Respondent agrees in substance, but argues that although prior cases employed the term "well-founded fear," they misconstrued the meaning of the term under the United Nations Protocol.

For purposes of our analysis, we may assume, as the Court of Appeals concluded, that the well-founded-fear standard is more generous than the clear-probability-of-persecution standard because we can identify no basis in the legislative history for applying that standard in § 243(h) proceedings or any legislative intent to alter the pre-existing practice.

The principal motivation for the enactment of the Refugee Act of 1980 was a desire to revise and regularize the procedures governing the admission of refugees into the United States. The primary substantive change Congress intended to make under the Refugee Act, and indeed in our view the only substantive change even relevant to this case, was to eliminate the piecemeal approach to *admission* of refugees previously existing under § 203(a)(7) and § 212(d)(5) of the Immigration and Nationality Act, and § 108 of the regulations, and to establish a systematic scheme for admission and resettlement of refugees. S. Rep. No. 96–256, p. 1 (1979) (S. Rep.); H. R. Rep. No. 96–608, pp. 1–5 (1979) (H. R.

Rep.). The Act adopted, and indeed, expanded upon, the Protocol definition of "refugee," S. Rep., at 19; H. R. Rep., at 9–10, and intended that the definition would be construed consistently with the Protocol, S. Rep., at 9, 20. It was plainly recognized, however, that "merely because an individual or group of refugees comes within the definition will not guarantee resettlement in the United States. The Committee is of the opinion that the new definition does not create a new and expanded means of entry, but instead regularizes and formalizes the policies and practices that have been followed in recent years." H. R. Rep., at 10. The Congress distinguished between discretionary grants of refugee admission or asylum and the entitlement to a withholding of deportation if the § 243(h) standard was met. See id., at 17–18.[20]

---

[20] The House Judiciary Committee Report stated:

*"Asylum and Withholding of Deportation*

"Since 1968, the United States has been a party to the United States Refugee Protocol which incorporates the substance of the 1951 U.N. Convention of Refugees and which seeks to insure fair and humane treatment for refugees within the territory of the contracting states.

"Article 33 of the Convention, with certain exceptions, prohibits contracting states from expelling or returning a refugee to a territory where his or her life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group or political opinion. *The Committee Amendment conforms United States statutory law to our obligations under Article 33 in two of its provisions:*

"(1) *Asylum.*—The Committee Amendment establishes for the first time a provision in Federal law specifically relating to asylum. . . .

"Currently, United States asylum procedures are governed by regulations promulgated by the Attorney General under the authority of section 103 of the Immigration and Nationality Act (see 8 CFR 108), which grants the Attorney General authority to administer and enforce laws relating to immigration. No specific statutory basis for United States asylum policy currently exists. The asylum provision of this legislation would provide such a basis.

"The Committee wishes to insure a fair and workable asylum policy which is consistent with this country's tradition of welcoming the oppressed of other nations and with our obligations under international law,

Elimination of the geographic and ideological restrictions under the former § 203(a)(7) was thought to bring the United States' scheme into conformity with its obligations under the Protocol, see S. Rep., at 4, 15–16,[21] and in our view these references are to the United States' obligations under Article 34 to facilitate the naturalization of refugees within the definition of the Protocol. There is, as always, some ambiguity in the legislative history—the term "asylum," in particular, seems to be used in various ways, see, e. g., S. Rep., at 9, 16—but that is understandable given that the same problem with nomenclature has been evident in case law as well. See *In re Lam*, Interim Dec. No. 2857, p. 5 (BIA, Mar. 24, 1981).

---

and feels it is both necessary and desirable that United States domestic law include the asylum provision in the instant legislation. . . .

"(2) *Withholding of Deportation.*—Related to Article 33 is the implementation of section 243(h) of the Immigration and Nationality Act. That section currently authorizes the Attorney General to withhold the deportation of any alien in the United States to any country where, in his opinion, the alien would be subject to persecution on account of race, religion, or political opinion.

"*Although this section has been held by court and administrative decisions to accord to aliens the protection required under Article 33, the Committee feels it is desirable, for the sake of clarity, to conform the language of that section to the Convention.* This legislation does so by prohibiting, with certain exceptions, the deportation of an alien to any country if the Attorney General determines that the alien's life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

"*As with the asylum provision, the Committee feels that the proposed change in section 243(h) is necessary so that U. S. statutory law clearly reflects our legal obligations under international agreements.*" H. R. Rep., at 17–18 (emphasis supplied).

[21] "As amended by the Committee, the bill establishes an asylum provision in the Immigration and Nationality Act for the first time by improving and clarifying the procedures for determining asylum claims filed by aliens who are physically present in the United States. The substantive standard is not changed; asylum will continue to be granted only to those who qualify under the terms of the United Nations Protocol Relating to the Status of Refugees, to which the United States acceded in November [1968]." S. Rep., at 9.

Going to the substance of the matter, however, it seems clear that Congress understood that refugee status alone did not require withholding of deportation, but rather, the alien had to satisfy the standard under § 243(h), S. Rep., at 16. The amendment of § 243(h) was explicitly recognized to be a mere conforming amendment, added "for the sake of clarity," and was plainly not intended to change the standard. H. R. Rep., at 17–18.

The Court of Appeals' decision rests on the mistaken premise that every alien who qualifies as a "refugee" under the statutory definition is also entitled to a withholding of deportation under § 243(h). We find no support for this conclusion in either the language of § 243(h), the structure of the amended Act, or the legislative history.[22]

---

[22] Nor is there any merit to respondent's argument that this construction is inconsistent with the Protocol. Existing domestic statutory law in 1968 was largely consistent with the Protocol. Under the Protocol, however, attaining the status of "refugee" was essential in order for an alien to assert his right under Article 33 to avoid deportation, and then he was protected only against deportation to a territory where his "life or freedom" would be threatened. Under our statutory scheme, on the other hand, no alien in the United States would be deported to a country where he was likely to be "persecuted," a seemingly broader concept than threats to "life or freedom." In addition, the alien would qualify for withholding even if he might not be a "refugee" under the Protocol because, for example, he was not outside his country of nationality owing to a fear of persecution. Cf. *Rosenberg* v. *Yee Chien Woo*, 402 U. S. 49, 57 (1971). Moreover, the domestic statute and regulations provided many additional procedural safeguards as well, including a right to be represented by counsel and a right to judicial review.

While refugee status was not essential to avoid withholding of deportation, it was essential under domestic law to qualify for preferential immigration status. Our definition of a "refugee" under § 203(a)(7) was of course consistent with the Protocol. Indeed, the relevant statutory language virtually mirrored the Protocol definition. The geographic and ideological limitations were limits on admission. That was not inconsistent with the Protocol—the Protocol did not require admission at all, nor did it preclude a signatory from exercising judgment among classes of refugees within the Protocol definition in determining whom to admit. Article 34 merely

We have deliberately avoided any attempt to state the governing standard beyond noting that it requires that an application be supported by evidence establishing that it is more

called on nations to facilitate the admission of refugees *to the extent possible;* the language of Article 34 was precatory and not self-executing. The point is not, however, that the Senate was merely led to *believe* accession would work no substantial change in the law; the point is that it did not work a substantial change in the law.

There were of course differences between the Protocol and the text of domestic law. The most significant difference was that Article 33 gave the refugee an entitlement to avoid deportation to a country in which his life or freedom would be threatened, whereas domestic law merely provided the Attorney General with discretion to grant withholding of deportation on grounds of persecution. The Attorney General, however, could naturally accommodate the Protocol simply by exercising his discretion to grant such relief in each case in which the required showing was made, and hence no amendment of the existing statutory language was necessary. There were other differences between the Protocol and the text of domestic statutory law in 1968—*e. g.,* the Protocol provides protection for those persecuted on grounds of nationality and membership in social groups, as well as race, religion, or political opinion. Given our existing statutory provisions, and the considerable discretion an administrator such as the Attorney General possesses in interpreting and implementing such statutory provisions, once again, no amendment of the statute was necessary. Finally, the Protocol required a showing that the "refugee's life or freedom would be threatened," while § 243(h) required that the alien would be subject to "persecution." Although one might argue that the concept of "persecution" is broad enough to encompass matters other than threats to "life or freedom"—deprivations of property, for example—and therefore that the Protocol was narrower than the coverage of the section, we perceive no basis for concluding that the particular mention of the alien's interest in "life or freedom" made the Protocol any more generous than domestic law.

In summary, then, to the extent that domestic law was more generous than the Protocol, the Attorney General would not alter existing practice; to the extent that the Protocol was more generous than the bare text of § 243(h) would necessarily require, the Attorney General would honor the requirements of the Protocol and hence there was no need for modifying the language of § 243(h) itself. As the Secretary of State *correctly* explained at the time of consideration of the Protocol: "[F]oremost among the rights which the Protocol would guarantee to refugees is the prohibition (under Article 33 of the Convention) against their expulsion or return to

likely than not that the alien would be subject to persecution on one of the specified grounds. This standard is a familiar one to immigration authorities and reviewing courts, and Congress did not intend to alter it in 1980. We observe that shortly after adoption of the Refugee Act, the Board explained: "As we have only quite recently acquired jurisdiction over asylum claims, we are only just now beginning to resolve some of the problems caused by this addition to our jurisdiction, including the problem of determining exactly how withholding of deportation and asylum are to fit together." *In re Lam*, Interim Dec. No. 2857, p. 6, n. 4 (BIA, Mar. 24, 1981). Today we resolve one of those problems by deciding that the "clear probability of persecution" standard remains applicable to § 243(h) withholding of deportation claims. We do not decide the meaning of the phrase "well-founded fear of persecution" which is applicable by the terms of the Act and regulations to requests for discretionary asylum. That issue is not presented by this case.

The Court of Appeals granted respondent relief based on its understanding of a standard which, even if properly understood, does not entitle an alien to withholding of deportation under § 243(h). Our holding does, of course, require the Court of Appeals to reexamine this record to determine whether the evidence submitted by respondent entitles him to a plenary hearing under the proper standard.

The judgment of the Court of Appeals is reversed, and the cause is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

any country in which their life or freedom would be threatened. This article is comparable to Section 243(h) of the Immigration and Nationality Act . . . and it can be implemented within the administrative discretion provided by existing regulations." S. Exec. K, 90th Cong., 2d Sess., VIII (1968).