**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 9, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 03-60670

XIAODONG LI,

Petitioner,

versus

ALBERTO GONZALES,
Attorney General of the United States,

Respondent.

Petition for Review of an Order from
the Bureau of Immigration Appeals

Before GARWOOD, BENAVIDES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The question presented in this case is whether a Chinese Christian who was prosecuted for holding an illegal religious gathering and conducting an underground church was persecuted on account of his religious beliefs, which would entitle him to withholding of removal pursuant to 8 U.S.C. § 1253(h) of the Immigration and Nationality Act. The immigration judge found Li to be eligible for withholding of removal. The Board of Immigration Appeals (BIA) reversed the immigration judge's decision and dismissed Li's application. Li brings this petition for review of the BIA's order. For the following reasons, we affirm the BIA's decision.

<u>FACTUAL AND PROCEDURAL BACKGROUND</u>

Xiaodong Li, a native and citizen of the People's Republic of China, was admitted to the United States as a crewman on a cruise ship on November 4, 1995, with permission to remain until his ship left port for a period not to exceed twenty-nine days. Li did not depart as required, and the Immigration and Naturalization Service (INS) instituted removal proceedings on September 21, 1999.[1] Li appeared before an immigration judge (IJ) on October 14, 1999, admitted the allegations against him and conceded that he was subject to removal. Li applied for asylum, withholding of removal, and protection under the Convention Against Torture Act (CAT), and in the alternative, sought voluntary departure.

The IJ conducted a hearing, during which Li, represented by counsel, was the only witness to testify. Through an interpreter, Li gave the following testimony during the hearing: Li grew up in Ningbo, China, and his parents continue to live there. Li was born into a Christian family, but the Chinese leadership, the Chinese Communist Party, suppressed religious activities, and his parents did not allow him to participate in the church.

Li's friend, Gao Ying, invited him to join a government church in November 1989, and Li signed up to be a member. In December 1989, the administrators of Li's school learned of his participation in the church and warned him against participating in a religion that did not support the Chinese Communist Party. The administrators threatened to discharge Li from school and to inform the police if he continued his participation. Li ended his participation in the government church.

---

[1] As of March 1, 2003, the INS's administrative, service, and enforcement functions were transferred from the Department of Justice to the new Department of Homeland Security. The Bureau of Immigration and Customs Enforcement in the Department of Homeland Security assumed the INS's detention, removal, enforcement and investigative functions.

Li then became involved in an underground church. He and his friend, Gao Ying, organized a group of six or seven members and held meetings at Li's home on Sundays. Li's parents did not approve of the meetings because they feared trouble if the police found out about them. During the meetings, the group studied the Bible and exchanged religious materials. The meetings began in December 1989, and continued through April 1995.

In December 1994, the police came to Li's house during a meeting, but found no religious materials and took no action. The police warned Li not to spread reactionary materials or religious materials. The group continued to have meetings, and the police returned in April 1995, at which time they found religious materials in Li's home. The police advised Li that he was holding an illegal gathering, and Li responded that the Constitution gave him the freedom to practice a religion. The police arrested Li for being a reactionary. He was the only participant arrested because he was recognized as the organizer of the gathering at his home.

Li was handcuffed and taken to the police station, where he was placed in a room and told to kneel. When he refused, the police beat him, kicking his leg in the back, hitting him in the head, and pulling his hair, forcing him to kneel. The police interrogated Li, seeking his admission that he was involved in an illegal gathering and had conducted an underground church, but Li refused to plead guilty. Li stated that there were two policemen in the room and one was holding a police bar, which he used to hit Li if the officer did not like Li's responses to the questions.

After two hours of questioning, Li signed a written confession, acknowledging that he was pleading guilty to conducting an illegal gathering against the government and organizing an underground church. Li was detained with a number of other prisoners under abusive conditions for five days, until he was bailed out by his uncle. Li lost his job and the police forced him to work in

the streets cleaning public toilets, without pay.  He continued doing this work until he left the country.

Li obtained a visa and a passport and left the country on November 4, 1995.  After he had agreed to plead guilty, Li had been told that a hearing would be set in six months.  He left the country before the hearing was conducted because he believed that he would have been sentenced to prison.  Li testified that he did not believe that there was any part of China where he could practice his religion without harassment.

Li did not file an application for asylum until July 1999 because he had planned on returning to China.  He testified that he had hoped that China's policy on religious practice would change, and he could return home without being subject to persecution.  Li reported that he had sent religious materials back to China and that when the police discovered the materials, in March 1999, they interrogated his family members.  The police warned his family to report to them if Li returned to China and warned them that if they did not the family members would be charged with an offense.  After that incident, Li stated that he realized that China's policy had not changed toward underground churches and that conditions had worsened.  He learned in May 1999 that his friend, Gao Ying, had been arrested and sentenced to prison for two years.  Li testified that he believed that if he returned to China, he would face oppression, arrest, interrogation, jail time, and torture.

Li admitted on cross-examination that he had never registered his church and that it was an underground church.  He explained that if he registered the church, the Government would use it for its own propaganda purposes.  He agreed that it was against the law in China to have an underground church and that he had been arrested for a legal violation.  Li also admitted that he had no problems with the church in the six years prior to the police visit in 1994.  He stated that the bar used to beat

4

him was an electric black wand and that the officer shocked him with the bar if the officer dislike Li's responses. After Li was released from detention, he did not see a doctor or go to the hospital for treatment because he had been fired and the medical costs would have been high. Li testified that he obtained a passport from the foreign affairs and training department in June 1995, and a visa in October. He was able to fly out of Shanghai without being stopped.

Li testified that he left the cruise line in January 1996, and moved to Houston, where he lives with a friend. Li applied for asylum in August 1999, after learning of his friend's imprisonment for religious activities, his family's interrogation in March, and that the police were looking for him because he had sent religious materials to China.

Reports the state department submitted as evidence reflect that the Chinese Government's policy is to allow religious groups only if the group advocates the communist doctrine of socialism, and that a campaign occurred, between 1994 and 1997, to suppress the activities of all unregistered religious groups.

The IJ denied the application for asylum because Li failed to file it within one year of his arrival. The IJ also determined that Li was not entitled to relief under CAT. Li has not challenged the IJ's ruling denying his application for asylum or the denial of relief under the CAT. However, the IJ granted Li withholding of removal and held that Li cannot be removed to China unless circumstances there change. In his oral decision, the IJ found that Li was a credible witness with respect to his testimony about his personal experience in China. The IJ also determined that the testimony was consistent with the information provided by the United States State Department about the practices in China regarding undergro und religious organizations. The IJ recognized that unregistered religious activity in China is a punishable offense. The IJ further noted that the materials

5

provided by the State Department showed that between 1994 and 1997, which included the time of Li's 1995 arrest, the police had stepped up a campaign against unregistered religious groups.

The IJ determined that the Chinese law against unregistered religious activities was an institutional form of persecution aimed at persons engaged in religious activities who cannot be controlled by the Government. The IJ found no evidence that the prohibition against unregistered religious groups is related to a legitimate attempt to stop terrorism or other legitimate interests in public order. The IJ concluded that if Li returned to China, it was more likely than not that he would be subject to persecution based on his religious activities in 1995.

The INS appealed the IJ's order granting withholding of removal. The BIA determined that Li was a credible witness but concluded that he had failed to show that it was more likely than not that he would be persecuted if he returns to China. The BIA averred that Li was punished for violating the law regarding unregistered churches and not because of his religion. The BIA further stated that the Chinese Government has a legitimate right to enforce the laws which it enacts and that Li's fears were of prosecution and not persecution. Finally, the BIA concluded that punishment by the Chinese government for violating its strict regulations of the amount of religious materials available to its citizens and the amount of materials brought into the country is also not a form of persecution. Li subsequently filed a timely petition for review.

DISCUSSION

"We have authority to review only an order of the BIA, . . . unless the IJ's decision has some impact on the BIA's decision." Mikhael v. INS, 115 F.3d 299, 302 (5th Cir. 1997) (citing Chun v. INS, 40 F.3d 76, 78 (5th Cir.1994)). Here, the BIA did not adopt the decision of the IJ, thus, our review is limited to the BIA's decision.

6

We review factual findings of the Board to determine if they are supported by "substantial evidence" in the record which means we will reverse the Board's factual findings only when the evidence is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). The BIA's legal conclusions are reviewed *de novo*. Rojas v. INS, 937 F.2d 186, 189 (5th Cir. 1991).

This court will "accord deference to the BIA's interpretation of immigration statutes unless the record reveals compelling evidence that the BIA's interpretation is incorrect." Id. In reviewing the BIA's construction of immigration statutes, if Congress has evidenced clear and unambiguous intent concerning the question before he court, then the court will give effect to Congress' intent. White v. INS, 75 F.3d 213, 215 (5th Cir. 1996) (citing Chevron, U.S.A., Inc. V. Nat'l Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984)). If a statute is silent or ambiguous, the court will defer to the agency's interpretation if it is based on a permissible construction of the statute. Id. Under this standard, the court will not substitute its judgment for that of the BIA, but the court must reject any interpretation by the BIA that is arbitrary, capricious, or manifestly contrary to a statute. Chevron, 467 U.S. at 844.

Li asserts that when the BIA denied his application for withholding of removal, the Board failed to apply its own established precedent. He argues that the BIA has considered certain criteria–criteria he fails to identify–in evaluating whether prosecution by a foreign sovereign amounts to persecution on account of a protected ground or punishment for a criminal act. He contends that the criteria the BIA has used in its analysis essentially boils down to a nexus test; i.e. whether there is a nexus between the conduct the law proscribes and a threat to the applicant's life or freedom based on a protected ground. He contends that in contravention of the BIA's own past precedent, the

7

Board stated Li faces prosecution for a criminal violation and not on account of a protected ground without conducting a nexus test. Li argues that applying the BIA's own rules to the facts of his case, it is clear that there is a close nexus between the conduct proscribed by China's law on unregistered churches and religious conduct, which is protected by statute. Li emphasizes that China's law against unregistered churches is targeted to prohibit undoubtably religious activities, i.e. unregistered communal worship, the study of sacred texts, etc.

The government counters that the record evidences that China does not prohibit registered religions. Instead, the government contends that China's motivation for its law that prohibits unregistered churches is tied to its desire to control religion in order to maintain social order, not a desire to persecute based on religious beliefs. The government asserts that there is not sufficient evidence in the record to compel the finding that Li's criminal prosecution amounts to persecution on account of his religion.

An otherwise deportable alien who claims they would be persecuted if deported has two methods of relief available to them: withholding of removal and asylum. The alien applying for withholding must demonstrate that "his life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b). Unlike asylum claims, which are granted to qualified aliens at the discretion of the Attorney General, the former § 1253(h) of the immigration statute *requires* that the Attorney General withhold deportation of an alien if his "life or freedom would be threatened" on account of one of the enumerated grounds.[2] 8 U.S.C. § 1253(h)(1996). Congress'

---

[2] Section 1253(h)(1) read:

The Attorney General shall not deport any alien (other than an alien described in

purpose in enacting § 1253(h) was to mirror the provisions of the United Nations Convention Relating to the Status of Refugees, which imposes a mandatory duty on contracting states not to return an alien to a country in which his life or freedom would be threatened on account of the same enumerated grounds. INS v. Cardoza-Fonseca, 480 U.S. 421, 429, 436-37 (1987) (citing Article 33.1 of the Convention, 189 U.N.T.S. 150, 176 (1954), reprinted in 19 U.S.T. 6259, 6276). The Handbook on Procedures and Criteria for Determining Refugee Status, issued by the Office of the United Nations High Commissioner, provides significant guidance in construing the United Nations Convention Relating to the Status of Refugees and, consequently, Congress' intent as to the asylum and withholding of removal statutes. Id. at 438, 439 n.22.

Although the term persecution is not used in the withholding of removal statute, the Supreme Court has established that an alien applying for withholding of removal has the burden to prove that there is a "clear probability of persecution" upon return to his country of origin. INS v. Stevic, 467 U.S. 407, 413 (1984). A "clear probability" means that the applicant will more likely than not be persecuted if deported. Cardoza-Fonseca, 480 U.S. at 430; Stevic, 467 U.S. at 429-30. The alien's testimony alone, if credible, is sufficient to sustain the burden. 8 C.F.R. 208.16(b). "If the applicant is determined to have suffered past persecution in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion, it shall be presumed that" he has satisfied his burden. 8 C.F.R. §208.16(b)(1).

The term "persecution" is not defined in the immigration statute, Chang v. INS, 119 F.3d

---

section 1251(a)(4)(D) of this title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

9

1055, 1060 (3rd Cir. 1997), therefore, the court must accept any interpretation by the BIA that is not arbitrary, capricious, or manifestly contrary to the statute. Chevron, 467 U.S. at 844. The BIA has defined persecution as "harm or suffering that is inflicted upon an individual in order to punish him for possessing a belief or characteristic a persecutor seeks to overcome." Accord Matter of Acosta, 19 I. & N. Dec. 211, 212 (BIA 1985). Prosecution for violating laws of general applicability does not constitute persecution, unless the punishment was motivated by one of the enumerated grounds and the punishment was sufficiently serious or arbitrary. Abdel-Masieh v. INS, 73 F.3d 579, 584 (5th Cir. 1996) ("While punishment of criminal conduct in itself is not persecution, where that punishment . . . is 'excessive or arbitrary'--and is motivated by one of the specified grounds, such punishment would constitute persecution under the Act."); Acosta, 19 I & N. Dec. at 222 (stating that punishment for violating laws of general applicability, such as violating travel restrictions, is not persecution unless the punishment was imposed for "invidious reasons."); Chang, 119 F.3d at 1061 (fear of prosecution may be persecution "[i]f the prosecution is motivated by one of the enumerated factors, such as [religious freedom], and if the punishment under the law is sufficiently serious to constitute persecution"); INS v. Rodriguez-Roman, 98 F.3d 416, 427-29 (9th Cir. 1996) (holding that prosecution for illegal departure can constitute persecution if the punishment is motivated by the alien's political opinion and the punishment is severe); Sovich v. Esperdy, 319 F.2d 21, 28-30 (2d Cir.1963).

The Supreme Court has held that persecution is "on account of" one of the protected grounds if the persecutor's motivation to harm the victim is on account of the victim's possession of the characteristic at issue. Elias-Zacarias, 502 U.S. at 482. The Court stated, as an example, that the Nazi regime's persecution of Jews was not persecution on account of political opinion. Id. While,

10

the Nazis' persecution was part of the pursuit of *their* political goals, the Nazis were not motivated by a desire to overcome a political opinion held by Jews; therefore, the persecution was not "on account of" political opinion. Likewise, the Court stated that "if a fundamentalist Moslem regime persecutes democrats, it is not engaging in persecution on account of religion." Id. The federal courts and the BIA have also recognized that an alien may demonstrate that a persecutor's actions were on account of a protected characteristic even if a persecutor had mixed motivations; a persecutor does not have to be motivated solely by the victim's possession of a protected characteristic. Girma v. INS, 283 F.3d 664, 667-68 (5th Cir. 2002) (holding that the alien need not prove that the persecutor was motivated by a protected ground to the exclusion of all other motivations). The question thus becomes whether China was motivated, at least in part, by Li's religion in punishing Li.

The BIA held that Li did not establish that he would be persecuted if he was returned to China because Li did not prove that his punishment was on account of his religion. The BIA held that Li was punished for violating the law regarding unregistered churches and not because of his religion. The BIA noted that "China does not prohibit registered religions and its law is a legitimate sovereign right 'not institutional persecution.'"

We find it necessary at this point to examine China's regulation of religion in order to determine whether the Chinese government was punishing Li on account of his religion when it charged him with violating its religious regulations. The evidence in the record establishes the following: China recognizes five "official" religions: Catholicism, Protestantism, Buddhism, Islam and Taoism. DEP'T OF STATE, 106TH CONG., COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 1998 855 (Comm. Print 1999). Religious groups must be registered with the government's Religious

11

Affairs Bureau (RAB).  Id. at 854-55.  Government sanctioned "patriotic religious organizations" supervise religious groups and must in turn report to the RAB.  Id.  Religious activity is permitted only at places of worship and by groups that are registered with the RAB and come under the supervision of the corresponding patriotic organization.  Id. at 853-57.  For example, the government legally permits only Christian groups registered with the Catholic Patriotic Association or the (Protestant) Three-Self Patriotic Movement committee.  DEP'T OF STATE, BUREAU OF DEMOCRACY, CHINA: PROFILE OF ASYLUM CLAIMS AND COUNTRY CONDITIONS 6-7 (April 14, 1998).  Since Li would be classified as a Protestant, his group would be supervised by the Three-Self Patriotic Movement committee.  The Three-Self Patriotic Movement committee is a political organization established to oversee official Protestant church matters, promote patriotism and promote the three principles of self-administration, self-support, and self-propagation.  Id.

To become a registered religious group, the group must: possess an approved meeting place; contain citizens who are religious believers and who regularly take part in religious activity; have an organized governing board; have a minimum number of followers; have a set of operating rules; and have a legal source of income.  DEP'T OF STATE, 106TH CONG., COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 1998 854.  Li testified that other than the fact that his group had a regular meeting time and place, his group had no governing board or rules or other such formal structure. For this reason, Li's practice of meeting with seven other friends at his home to study the bible and sing hymns would not have been blessed with the government's approval and granted registration.


The Chinese government reported in 1997 that there are over 12,000 churches and 25,000 meeting places for the 10 to 15 million registered Protestant citizens; however, there are anywhere

from 30 million to 80 million Chinese citizens who worship in house churches that are independent of government control like Li. Id. at 856. Unofficial groups claim that government authorities often refuse them registration without explanation, but, it is not the case here that Li attempted to register his group but was refused. Id. Religious activity that is not conducted by a group registered by the government at a place of worship sanctioned by the government is illegal. The State Department's country report in the record establishes that unregistered religious groups are the targets of harassment, detention, physical abuse, and interrogations. Id. at 838-39, 854-58.

The BIA credited Li's testimony that he suffered at the hands of the Chinese government because of his unregistered religious activities, and the record reflects that the Chinese government– particularly during the time period in which Li was targeted– harassed, interrogated, detained and physically abused members of unauthorized religious groups. However, as the government and the BIA observe, China does permit registered Protestant groups to practice their religion. The country report states that members of registered religious groups report little to no harassment from the government. Li testified that when he was a member of a registered Christian church he suffered harassment and threats from his school, but harassment from his school is insufficient to constitute persecution.

Li argues that it should be beyond peradventure that he was persecuted on account of his religion because he was arrested and abused as a result of clearly religious activities. We agree that it is axiomatic that Li was punished because of religious activities, nonetheless, it does not necessarily follow that Li was punished because of his religion. With respect to the question of whether he was persecution based on his religion or whether he faces prosecution for his activities, albeit religious activities, it is a close question and Li's arguments have some force as shown by the IJ's decision,

13

which found in his favor. Nevertheless, the BIA concluded that the record shows Li faces prosecution for illegal activities if returned to China, not persecution on account of religion. The standard of review confines us to grant a reversal only if the evidence presented is such that a reasonable factfinder would have to conclude that persecution existed. See Elias-Zacarias, 502 U.S. at 481. We must find that the evidence in the record *compels* reversal of the BIA's conclusion. Id. at 481 n.1 (stating that to reverse the BIA's factual finding that persecution on account of political opinion existed, the court must find that the evidence not only supports that conclusion but compels it). Having conducted an independent review of the record, we are unable to conclude that the record before us compels reversal. The record establishes that the Chinese government does permit millions of its citizens to practice Christianity without punishment as long as they are members of registered groups. The evidence suggests that the Chinese government condones, or rather tolerates, the Christian faith and seeks to punish only the unregistered aspect of Li's activities. There is therefore reasonable, substantial, and probative evidence to support the BIA's decision that Li's punishment was for his activities and not for his religion, and there is nothing in the record that mandates us to find otherwise. Id. Thus, there is nothing in this record that compels us to find that it is more likely than not Li would be persecuted based on his religion if he was returned to China.[3]

---

[3] Li stated that he did not want to register his religious group because he did not agree with the Government's requirement that registered churches promote Communism and alter church teachings so as to not conflict with Socialist thought. Li also testified that the police accused him of being a reactionary against the government and he was arrested for, *inter alia*, conducting an illegal gathering against the government. The Government asserts that China regulates religion based on a concern that unregulated religious gatherings are a challenge to their authority and an alternative to Communist thought. Finally, the Three-Self Patriotic Movement committee that registered Protestant groups are supervised by is a "political" organization. Based on this record, perhaps it would have been more appropriate for Li to argue that he was persecuted based on his political opinion.

Clearly, we are faced with a complicated issue in this case. The issue in this case is perplexing not only because it involves affairs of a foreign state that are contrary to our fundamental ideals but also because the line between religious belief and religious activity here is indeed a fine one and it is colored by sensitive political and religious concerns. However, while we may abhor China's practice of restricting its citizens from gathering in a private home to read the gospel and sing hymns, and abusing offenders, like Li, who commit such acts, that is a moral judgment not a legal one.[4] We are restricted by the confines of the withholding of removal standard and the record before us. Based on both, we cannot conclude that the BIA erred in denying Li withholding of removal.

## CONCLUSION

For the foregoing reasons, we AFFIRM the BIA's denial of Li's application for withholding of removal.

AFFIRMED.

---

[4] Notwithstanding the substantial discussion by the immigration judge and the BIA as to the many complexities of this case, one of the many probing questions that there is no definitive answer to is whether Chinese law makes a distinction between merely praying or discussing religious beliefs at home with family or friends, and organizing and operating an unregistered church. There is no definitive determination in the record as to how broadly Chinese law defines a "church" or a "religious group" (or whether Chinese law precludes a registered church from having a home location). We are not called upon to determine whether prosecution for merely saying a personal prayer in the presence of one or more others, or discussing religious beliefs at home in the presence of one or more others, is persecution on account of religion.