Munaim J. DAWOOD–HAIO, Petitioner,

v.

IMMIGRATION & NATURALIZATION SERVICE, Respondent.

No. 84–3552.

United States Court of Appeals, Sixth Circuit.

Submitted March 31, 1986.

Decided Sept. 5, 1986.

Arpo Yemen, Southfield, Mich., for petitioner.

Thomas W. Hussey, Robert Kendall, Jr., Office of Immigration Litigation, Crim. Div., Washington, D.C., Nicholas J. Pantel, Christopher Barnes, U.S. Atty., Cincinnati, Ohio, for respondent.

Before KEITH and NELSON, Circuit Judges, and EDWARDS, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This case is before us on a petition for review of an order of the Board of Immigration Appeals denying a motion to recon-

sider an earlier refusal to grant petitioner asylum as a "refugee." We shall grant the petition for review, having concluded that the Board erred in determining that petitioner is not a refugee and abused its discretion in declining to reconsider that determination.

## I

The papers in the administrative record indicate that petitioner was born in Iraq, of Iraqi parents, in 1962. He and his family are Chaldeans of the Roman Catholic faith. His parents owned a plot of land in Iraq that was farmed by his father. In 1976, some eight years after the Arab Baath Socialist Party had overthrown the government of Iraq in a coup d'etat, petitioner's father was jailed for refusal to join the Baath Party. The father died in jail of a "heart attack" after having been imprisoned four months. He was 46 years old and had no previous history of illness. The revolutionary regime seized the father's half of the family land, but allowed petitioner's mother to keep her half. She continued to cultivate the remaining land.

Petitioner was arrested and jailed for two days late in 1979 in an effort to persuade him to join the Baath party. Petitioner persisted in his refusal to become a party member.

Petitioner had difficulty in obtaining an Iraqi passport, but finally got one after repeated applications. He left Iraq in August of 1980, having been issued a non-immigrant visa for a visit to the United States, and went to Detroit, Michigan.

We take judicial notice of the fact that Iraq launched a full-scale invasion of neighboring Iran in September of 1980, beginning a sanguinary war that was to see Iraq charged with use of chemical and bacteriological weapons.

Petitioner's visa was scheduled to expire on October 15, 1980. Prior to that date petitioner filed with the Immigration and Naturalization Service in Detroit a request for asylum typed on Form I–589. The form was dated October 8, 1980, and it bears a date stamp evidencing receipt by I.N.S. on October 14, 1980.

The procedure under which petitioner sought asylum was established by the Attorney General pursuant to § 208 of the Immigration and Nationality Act of 1952. (Section 208 is a 1980 addition codified at 8 U.S.C. § 1158(a).) That statute, which required the Attorney General to establish a procedure for an alien physically present in the United States to apply for asylum irrespective of his status, empowers the Attorney General to grant asylum, in his discretion, upon determining that the alien is a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A). The latter section defines a refugee in terms that include "any person" outside his home country who is "unwilling to return" because of a "well-founded fear of persecution on account of race, religion, nationality, membership in particular social group, or political opinion."

The asylum procedures adopted by the Attorney General are set forth at 8 C.F.R. Part 208. 8 C.F.R. § 208.3 provides for the filing of asylum applications on Form I–589. 8 C.F.R. § 208.5 places on the applicant for asylum the burden of proving that he comes within the statutory definition of a "refugee," but the section does not, by its terms, require that credible testimony of the applicant be rejected if not corroborated by independent evidence. 8 C.F.R. § 208.6 provides that the applicant shall be examined in person by an immigration officer or judge prior to adjudication of the application for asylum. 8 C.F.R. § 208.7 provides that "[u]pon receipt of Form I–589, the district director shall in all cases request an advisory opinion from the Bureau of Human Rights and Humanitarian Affairs (BHRHA) of the Department of State."

No such advisory opinion was requested "upon receipt" of petitioner's asylum application, but petitioner was examined in person by an immigration officer on January 21, 1981. The examiner seems to have reviewed each section of the asylum request with petitioner and his interpreter. Petitioner signed the form before the ex-

aminer, swearing that the statements therein were true and correct.

Petitioner's asylum application bears several handwritten notes added by the examiner at the time of the interview. These notes indicate, among other things, that the arrest and imprisonment of petitioner's father in 1976 had occurred "because he wouldn't join the party" and that petitioner's own incarceration had occurred in "1980 or late 1979."

Block 17 on the form asks "If you return to your country, for what specific reasons do you believe you will be persecuted?" Petitioner responded to this question by checking boxes marked "religion," "nationality," and "political opinion;" the examiner wrote the words "Catholic," "Chaldean," and "anti-Baath" below these boxes. The information on the incarceration of petitioner and his father was given in response to the next question, in block 18, which asks "Have you or any member of your family ever been detained, interrogated, arrested, convicted and sentenced, or imprisoned because of the above?" If this question is answered "yes," as it was in petitioner's case, the form instructs the applicant to "cite instances." Petitioner did so, stating

"My own father died of a heart attack while arrested and jailed for 4 months (4/76 to 8/76). He was 46.

"I was detained and jailed for 2 days while being brain washed to join the Baatt [sic] Party."

Question 20 asks "Did you belong to any organization(s) which were considered hostile to the interests of your Home Country?" Petitioner checked "no," but added "However, my ethnic and religious affiliation brands me as a member of a hostile organization."

Question 23 asks "Have you taken any actions that you believe will result in persecution in your Home Country?" Petitioner checked "yes," and explained "I refused to join the Baatt [sic] Party, I refused to serve in the Army, I defected and sought asylum in the U.S.A. while openly criticizing the regime."

Among the questions asked in block 26 was "What do you think would happen to you if you returned?" Petitioner's answer was "Certain arrest, jail, torture, possibly execution."

Under date of April 9, 1981, the immigration examiner prepared a file memorandum summarizing his interview with petitioner. The memorandum says, among other things:

"Subject stated that he is a Chaldean Christian (Roman Catholic) and, as such, is constantly harassed by the Moslem majority in Iraq. Additionally, as a Christian he is opposed to the Baath Party and would like to see a new government in Iraq. Subject claims that he has never been arrested but has been detained for 2 days in late 1979 because he wouldn't join the Baath Party. He also claims that his father died of a heart attack in 1976 while in jail for his refusal to join the Baath Party. The subject belongs to no political parties, societies, or organizations which are hostile to the Iraqi government. He has never spoken out publicly concerning his opposition to the government. He gives the appearance of a well fed, contented person at peace with his station in life. He has not been deprived of any basic necessities of life and has been allowed to practice his religion. He is of military draft age and fears being inducted for up to 7 years. He claims that Christians never get out of the army alive.

\*　　\*　　\*　　\*　　\*　　\*

"It is the opinion of this officer that subject's claim is totally frivolous and lacking in merit. He has not documented any specific instances of persecution against him by the Iraqi government and appears to be using the asylum route to avoid the military service. In light of the recent determination that Iraqi Christians are not, as a class, subject to persecution this officer feels that subject has not sustained the burden of proving he is or will be persecuted in Iraq. Therefore,

I will refer to BHRHA with a recommendation of denial."

The "recent determination" referred to is a letter that an Assistant Secretary of State sent I.N.S. on May 23, 1980, rescinding a blanket recommendation made in June of 1978 not to repatriate to Iraq any Iraqi Christians applying for asylum in the United States. While stating that "Iraqi Christians, as a group, are not automatically subject to persecution on the basis of religion," the letter says the State Department "will continue to carefully evaluate each request [for asylum]," and "[i]n such cases that we believe the applicant has established a well-founded fear of persecution upon return to Iraq, we will so notify the appropriate INS District office."

On April 10, 1981, I.N.S. requested an advisory opinion from the State Department. The district director sent the asylum requests of petitioner and two other Iraqi nationals to the Asylum Unit of the State Department's Bureau of Human Rights and Humanitarian Affairs, enclosing a letter that was fairly explicit about the nature of the advisory opinion desired:

"The statements made during [the three applicants'] personal interviews can only be considered as self-serving in nature and insufficient to establish that the applicants have established a well founded fear of persecution upon return to Iraq within the meaning of the United Nations Convention and Protocol Relating to the Status of Refugees. In light of the Bureau's May 23, 1980 letter to the Acting Commissioner of this Service stating that Iraqi Christians are not, as a class, subject to persecution in Iraq, the requests appear to be frivolous in nature and lacking in merit. The credibility of the applicants in requesting asylum is low as they appear to be using the asylum procedures in order to prolong their stay in the United States."

By form letter dated July 7, 1981, the Chief of the Asylum Division replied that petitioner "does not appear to qualify for asylum." The form letter failed to take the hint that the credibility of the applicants was "low" because they were "using the asylum procedures in order to prolong their stay in the United States"; [1] the Bureau's letter expressly stated, on the contrary, that "[w]e have assumed the facts in this case as presented are true." The form letter goes on to state, without elaboration, that "we believe that the applicant has failed to establish a well-founded fear of being persecuted upon return to *Iraq* on account of race, religion, nationality, membership in a particular social group, or political opinion, as provided in the United Nations Convention and Protocol Relating to the Status of Refugees." (The form letter was prepared with blank spaces in which the name and number of the applicant, the name and the address of the district director, and the name of the applicant's home country, "Iraq," were individually typed.)

In an order recommended by the immigration examiner and approved on September 30, 1981, by the acting district director of I.N.S., petitioner's request for asylum was denied. Referring to the I.N.S. examiner's interview with petitioner, the order says, among other things:

"[petitioner] made sweeping generalizations concerning 'harassment' of all Christians by the Moslem majority in Iraq but produced no evidence to show that such 'harassment' does, in fact, occur or that it is encouraged by the policies of the Iraqi government. He belongs to no political parties, labor unions, or other organizations actively hostile to the Iraqi government and has never publicly criticized the government. He claims to have been jailed for two days in 1979 because of his failure to join the Baath Party but was unable to document the arrest .. He gave the appearance of a well fed, contented person at peace with his station in life and admitted that

**1.** 8 C.F.R. § 208.8, captioned "Decision by the district director," provides in section (e) that "[w]hen an I–589 is approved, asylum status shall be granted for a period of one year from the date of approval."

he has never been deprived of any basic necessities of life in Iraq. Further, he stated that he did have the freedom to practice his religion. He is of military draft age and fears induction into the army because Christians 'never get out (of the army) alive.' He has not produced evidence to support this conclusion. "At this point in the interview the applicant was asked to produce any and all evidence to support his allegations but was unable to do so. He was then informed that the request appeared to be frivolous in nature and without merit because he had failed to document one act of persecution against him by the Iraqi government."

Citing *Pereira-Diaz v. INS*, 551 F.2d 1149 (9th Cir.1977), and *Cheng Kai Fu v. INS*, 386 F.2d 750 (2d Cir.1967), *cert. denied*, 390 U.S. 1003, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968), (both of which are pre–1980 decisions dealing with a version of § 243(h) of the Immigration and Naturalization Act (8 U.S.C. § 1253(h)) that gave the Attorney General discretion to withhold deportation to a country in which he thought the alien would be subject to persecution on account of race, religion, or political opinion), the district director's order suggests that the existence of a "well-founded fear of persecution" on the applicant's part cannot be established by the applicant's own testimony standing alone, and can only be established by evidence showing a "clear probability" of individualized persecution.

The final paragraph of the district director's order concludes that petitioner was not eligible for asylum because

"The oral and written statements submitted in support of the request are not documented and can only be considered self serving in nature and without basis in fact. The documents submitted to support the request [newspaper articles and a Congressional report on human rights in Iraq] do not directly relate to the applicant and are insufficient to show the preponderance of evidence required...."

The asylum procedures provide that where an application for asylum has been denied by the district director, the applicant may renew his request for asylum before an immigration judge in deportation proceedings. 8 C.F.R. § 208.9. That was done here. Petitioner was ordered to appear before an immigration judge in Detroit to show cause why he should not be deported, and the transcript of the hearing on the show cause order discloses that the application for asylum was renewed by petitioner's counsel. Counsel interrogated petitioner briefly, through an interpreter, eliciting many of the facts outlined above. It was agreed that the immigration judge could also use petitioner's verified asylum application in reaching a decision.

In a written decision issued shortly after the hearing, the immigration judge denied the renewed claim for asylum, declined to withhold deportation, and in lieu of an order of deportation granted petitioner permission to depart voluntarily. Although the decision noted that petitioner's claim rested primarily upon the factual allegations set forth in the sworn application for asylum, the decision stated, without discussion of the contents of the application, that

"No past history of governmental action against [petitioner] was developed or proved by even a minimal amount of evidence on this record. [Petitioner] was never singled out individually for adverse specialized treatment by any governmental unit or any other groups allegedly a part of the Iraqi government while he resided in Iraq. * * * He entered the United States as a visitor and did not advance his claim until well after his nonimmigrant status had expired."

The proposition asserted in the last sentence is contradicted in the first paragraph of the decision, where the immigration judge acknowledged that petitioner "was authorized to remain in the United States until October 15, 1980 [and] advanced a claim to asylum before the Service on October 14, 1980...." More significantly, the immigration judge never addressed the evidence that petitioner had been arrested and

incarcerated in an effort to coerce him into joining the Baath Party. No explanation was offered for the findings, which appear contrary to the evidence, that there was no past history of governmental action against petitioner and that he had never been singled out individually for adverse specialized treatment by any group allegedly a part of the Iraqi government.

Through counsel, petitioner perfected a timely appeal to the Board of Immigration Appeals in Washington. Oral argument was waived. In an opinion and order entered on March 11, 1983, the Board dismissed the appeal, agreeing with the immigration judge that petitioner had failed to establish a well-founded fear of persecution. The Board did acknowledge petitioner's claim that he had been jailed for two days in order to convince him to join the Baath Party, but the Board went on to suggest that "[petitioner] could not specify when that detention took place, either in late 1979, or 1980." (The examiner's typewritten report says that petitioner claimed it occurred "in late 1979," and the I.N.S. trial attorney did not probe the matter in questioning petitioner at the hearing before the immigration judge.) Dismissing petitioner's account of his "arrests" as "vague and speculative," the Board concluded that petitioner had failed to show a well-founded fear of persecution either under the "clear probability" standard used by the district director or under a "good reason" standard or a "realistic likelihood" standard. Like the immigration judge, the Board extended permission for petitioner to depart from the United States voluntarily.

The regulations of the Board of Immigration Appeals authorize the filing of motions to reconsider, with or without new precedents, and there is no time limit for the filing of such a motion. 8 C.F.R. § 3.8; *Chudshevid v. INS*, 641 F.2d 780, 784 (9th Cir.1981). Petitioner filed a motion to reconsider and a supporting brief on March 26, 1984. The motion was denied on July 5, 1984, the Board reiterating that it found no adequate demonstration of a well-founded fear of persecution on account of any of the factors listed in the statutory definition of "refugee." This was so, said the Board, "whether his claim is assessed in terms of demonstrating a 'clear probability,' a 'realistic likelihood,' a 'reasonable possibility' of [sic] a 'good reason to fear' persecution."

Judicial review of all final orders of deportation may be obtained under the procedure prescribed by Chapter 158 of Title 28 of the United States Code, except that a petition for review may be filed not later than six months from the date of the final deportation order, (8 U.S.C. § 1105a(a)(1)), rather than within the 60 day period prescribed by 28 U.S.C. § 2344. The petition for review in this case was filed on October 29, 1984, and I.N.S. concedes, properly, that we have jurisdiction to determine whether the Board's denial of petitioner's motion to reconsider amounted to an abuse of discretion. Also before us is a request by petitioner to hold the case in abeyance pending action on a visa petition filed on petitioner's behalf by a woman to whom he was married last December.

## II

Petitioner claims to be entitled both to a withholding of deportation under § 243(h) of the Immigration and Nationality Act (8 U.S.C. § 1253(h)) and to political asylum under § 208(a) of the Act (8 U.S.C. § 1158(a)). These are "two separate claims, subject to two distinct standards." *Yousif v. INS*, 794 F.2d 236, 241 (6th Cir. 1986). The former statute makes a withholding of deportation mandatory if the alien shows what the courts term a "clear probability of persecution" in the event of a return to his home country. *Id.* at 242; *INS v. Stevic*, 467 U.S. 407, 424, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984). The statute covering requests for asylum, by way of contrast, authorizes a discretionary grant of asylum if the alien merely establishes that he is a "refugee." He can do that by showing that he is "unwilling" to return to his home country because of "a well-founded fear of persecution" on account of any of the factors listed in the statute. 8 U.S.C. § 1101(a)(42)(A). Al-

though there is authority in this Circuit for the proposition that an alien seeking asylum must demonstrate a "clear probability" of persecution, *Reyes v. INS,* 747 F.2d 1045 (6th Cir.1984), *vacating* 693 F.2d 597 (6th Cir.1982), *cert. denied,* 471 U.S. 1061, 105 S.Ct. 2173, 85 L.Ed.2d 491 (1985), this court subsequently recognized in *Yousif,* 794 F.2d at 243, that use of the "clear probability" standard in asylum cases governed by § 208 of the Act was not mandated by the Supreme Court's decision in *Stevic* and is not proper under the statute. The "well-founded fear" standard prescribed by § 208 is "more generous" to aliens than the "clear probability" standard, *Youkhanna v. INS,* 749 F.2d 360, 362 (6th Cir.1984); *Dolores v. INS,* 772 F.2d 223, 226 (6th Cir.1985); *Yousif v. INS,* 794 F.2d 236, 243–44, *supra,* because, as noted in *Dolores,* the "well-founded fear standard ... can be satisfied by credible *subjective* evidence and ... the fear may be based upon group characteristics such as the petitioner's religion." 772 F.2d at 226. (Emphasis supplied.) The district director erred, we believe, in applying the "clear probability" standard in the instant case, and the Board failed to offer any rational explanation of why, if the proper standard had been applied, petitioner would not have been found to be a refugee.

Petitioner has offered subjective evidence that his unwillingness to return to Iraq is a product of his fear of persecution as a Christian Chaldean who refused to join the ruling party despite coercive incarceration and who has remained away from his country because of antipathy (now publicly documented) to the regime currently in power. Given the fate that befell petitioner's father, given petitioner's own incarceration late in 1979, and given Iraq's continuing need for troops to fight its Iranian foe, it seems improbable that if petitioner were to be returned to Iraq at this point it would be to help his mother cultivate such of her land as has not been confiscated, rather than to go to jail or to the front. The immigration examiner and immigration judge reported nothing in petitioner's manner suggesting he was not telling the truth, and we have found no inconsistencies or omissions in the evidence presented by petitioner tending to cast doubt on his credibility. We are not overly impressed by the argument that petitioner's credibility is low because he is using the asylum procedures to obtain asylum.

The Chief of the Asylum Division of the State Department's Bureau of Human Rights and Humanitarian Affairs thought it appropriate, in rendering his advisory opinion, to use a form stating "[w]e ... have assumed the facts in this case as presented are true." The only stated reasons for the district director's unwillingness to make a similar assumption were that petitioner's sworn statements are "self serving in nature" and "are not documented." The district director's conclusion—that petitioner's statements are therefore "without basis in fact"—is a non-sequitur. That the death of petitioner's father in an Iraqi jail is "not documented" does not suggest to us that the testimony he died is "without basis in fact." It may have been "self-serving" for petitioner to mention the detention of his father and himself in responding to an I.N.S. questionaire that specifically requires such detentions to be disclosed, but the self-serving character of this testimony does not, to our minds, suggest it is "without basis in fact." Many of our fellow human beings live and die in a world where governments are more brutal than ours and less accustomed to documenting their misconduct; in considering evidence of how governments operate in that world, we ought not to jump to the assumption that what they have not documented they have not done.

It is true that in *Dally v. INS,* 744 F.2d 1191 (6th Cir.1984), and *Nasser v. INS,* 744 F.2d 542 (6th Cir.1984), both of which involved evidence not unlike that presented by petitioner here, this court acquiesced in denials of relief under both § 208 and § 243 of the Immigration and Nationality Act because the aliens' statements were undocumented and "self-serving." In both of these cases, however, the aliens' applications for asylum under § 208 and for withholding of deportation under § 243 all seem to have been dealt with under the "clear

probability" test. In light of the subsequent case law in this Circuit, we do not consider the use of that test appropriate in adjudicating a § 208 application for asylum as a refugee.

We are not unmindful of the fact that the United States has experienced a huge increase in asylum applications in recent years, and there may be a serious question as to how many refugees this country—which admits for permanent resettlement more than twice as many immigrants and refugees as the rest of the world combined—is capable of absorbing. See Zall, "Asylum and Sanctuary: The American Dilemma," 66 ABA Journal/August 1, 1986. That is not a question for the courts to decide, of course; it is a policy question of the kind properly answerable by the representatives of the electorate. Congress can define "refugee" as it chooses. It can change that definition whenever it thinks it needs changing, and it can establish whatever policy guidelines may from time to time seem appropriate for granting or withholding asylum to those who come within the statutory definition. Our job is not to decide what the law ought to be, but to see that the law as it currently exists is applied in accordance with its terms. We do not believe that the law has been so applied here.

Whether an alien comes within the statutory definition of a "refugee" is not a question of administrative discretion, but a question of fact. *Sagermark v. INS*, 767 F.2d 645, 649 (9th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). If the alien is in fact unwilling to return to his home country because of a well-founded fear of persecution, he has the status of a refugee—and is eligible for asylum under § 208—even though he may not have been able to document a "clear probability" of persecution with the kind of evidence apparently required for a mandatory withholding of deportation under § 243. As we read the record in this case, petitioner clearly made out a prima facie showing of eligibility for asylum as a refugee, and I.N.S. never articulated a rational basis for determining that petitioner is not, in fact, a refugee. Under these circumstances, we think it was an abuse of discretion for the Board to deny petitioner's motion for reconsideration notwithstanding the absence of affidavits or other material evidencing newly arisen or newly discovered circumstances. There is a difference between motions to reopen and motions to reconsider, and we are persuaded that petitioner is entitled to the reconsideration he seeks. I.N.S. may wish to reopen the hearing for further testimony from petitioner or others, and we assume it can do so on its own motion in connection with its reconsideration of the case.

We cannot say, at this juncture, that there has been an abuse of discretion in denying petitioner's request for asylum, because there has not yet been an informed exercise of discretion. The record does not indicate whether petitioner would or would not have been granted asylum if he had been found to be a "refugee," and that question remains to be decided if, on reconsideration, it is determined that petitioner is a refugee.

Accordingly, we GRANT the petition for review and REMAND the cause for reconsideration. This disposition makes it unnecessary for us to consider the request for a stay pending action on the visa petition filed on petitioner's behalf by his wife.