811 F.2d 606
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Farid KISHMESH, Dhafir Jamil Jundi Maher Mohammed Ikdeh, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 Nos. 85-3675, 85-3698 and 85-3717.
 United States Court of Appeals, Sixth Circuit.
 Dec. 4, 1986.
 
 Before KEITH and WELLFORD, Circuit Judges, and TODD,* U.S. District Judge.
 PER CURIAM:
 
 
 1
 Petitioners, in three separate cases consolidated for purposes of appeal, seek appellate review of final orders of deportation entered by the Board of Immigration Appeals. Each focuses on whether the Immigration and Naturalization Service (INS) abused its discretion in denying their requests for asylum and withholding of deportation pursuant to 8 U.S.C. Secs. 1158 and 1253(h). Additionally, they assert that the INS applied an improper legal standard in denying their claims for asylum.
 
 1. FARID MAROGI KISHMESH
 
 2
 Kishmesh is a native of Iraq. He came to the United States for pleasure as a nonimmigrant on October 15, 1977. On February 28, 1980, he was granted asylum in this country for one year. The 1980 grant of asylum was based on an INS policy that Iraqi Christians as a group had a basis on which to claim persecution.[1]
 
 
 3
 On May 29, 1981, Kishmesh submitted an application for adjustment of his status to become a lawful permanent resident based on a claimed refugee status. The district director, however, notified Kishmesh in writing of INS's intent to rescind his asylum status because the previous state department policy had been withdrawn. INS gave Kishmesh fifteen days in which he could submit evidence to demonstrate that he personally would be subject to persecution if forced to return to Iraq. Kishmesh failed to submit any additional evidence, and INS submitted his original asylum application to the State Department for review. After a review of his application, the State Department determined that Kishmesh was no longer entitled to asylum status given current conditions in Iraq.
 
 
 4
 On January 19, 1982, the district director rescinded petitioner's asylum status, denied his application for adjustment to lawful permanent resident, and placed petitioner in deportation proceedings by issuance of a show cause order. On December 13, 1983, Kishmesh appeared before an immigration judge, choosing to represent himself. Petitioner acknowledged that he was deportable as charged but renewed his application for asylum.
 
 
 5
 In a hearing on the merits the immigration judge admitted into the record petitioner's application for asylum wherein petitioner claimed that he feared persecution because of his religion as a Chaldean Christian and because of his absence from Iraq. He also claimed to have left Iraq because of religious discrimination and harassment, and because the government had arrested and interrogated him about his religious activities. Kishmesh also attached three affidavits from acquaintances, one of which stated his opinion that Kishmesh would be subject to government persecution on return to Iraq based on his religious convictions. Kishmesh also submitted a handwritten statement to the same effect. He testified that if he returned to Iraq, he would either be killed at the airport or jailed within a few weeks of his return because he had absented himself from Iraq for six years.
 
 
 6
 On cross-examination, Kishmesh admitted that he had not been in contact with Iraq in the last six years, that he had worked as a television repairman in Iraq, that he attended church there, and that he had served in the army for two years. On questioning by the immigration judge, petitioner contradicted statements in his asylum application, testifying that neither he nor any of his family had ever been arrested or jailed in Iraq and admitted that Catholic churches were open there and had never been closed. He testified, however, that he feared arrest if he returned to Iraq because of the length of his stay in the United States. He conceded that the laws prohibiting absences beyond the authorized period were applicable to everyone in Iraq, not just Christians.
 
 
 7
 After the hearing, the immigration judge issued his decision, finding petitioner deportable as charged and denying his application for asylum (granting him 30 days to depart voluntarily). The immigration judge found that Kishmesh's claim to asylum relied primarily on the fact that he would be persecuted for having remained outside the country for longer than authorized. The immigration judge concluded that petitioner's fears of persecution were based purely on his own speculation; he had failed to present any objective evidence that demonstrated a likelihood that he would be singled out for persecution or that established a well-founded fear of persecution.
 
 2. DHAFIR JAMIL JUNDI
 
 8
 Jundi is also a Chaldean Christian from Iraq who entered the United States on August 28, 1979 as a nonimmigrant visitor for pleasure. In 1981, the district director denied his petition for asylum and initiated deportation proceedings through issuance of a show cause order.
 
 
 9
 Jundi appeared before an immigration judge and was granted a continuance of the deportation hearing to obtain counsel. In May of 1984, with present counsel, he conceded deportability as charged but renewed his application for asylum, stating that he had a United States citizen wife who had filed a petition for immediate relative status on his behalf.[2] Jundi brought out that his parents, three brothers, and one sister were in the United States. Jundi's asylum application based his claim on his religion as a Chaldean Catholic and his having overstayed his visit to the United States.
 
 
 10
 At the hearing on the merits of petitioner's application for asylum, Jundi made certain changes to his asylum application form, including a statement that his parents were deceased. He testified that he had two brothers and two sisters in Iraq; he stated at another point, however, that one of his brothers and one sister had come to the United States.
 
 
 11
 Jundi testified that he had never joined a political party or group in Iraq, and had never been involved in any political activity there. He admitted that the church he attended in Iraq was open for worship, and that he had never been arrested by the Iraqi police. Finally, he stated that he did not want to return to Iraq because he believed he would be jailed for overstaying his visit to the United States.
 
 
 12
 The immigration judge issued his decision, finding petitioner deportable as charged and denying his applications for asylum, but granting him 30 days to depart this country voluntarily. The immigration judge found that petitioner's actual claim was based on his unsubstantiated fears that he would be jailed for overstaying his visit to the United States and that he had failed to prove that he would suffer some serious adverse treatment if returned to Iraq.[3]
 
 
 13
 On July 22, 1985, the Board upheld the immigration judge's decision and dismissed petitioner's administrative appeal.
 
 3. MAHER MOHAMMED IKDEH
 
 14
 Ikdeh is a native of Syria who entered this country on May 14, 1979, as a nonimmigrant student. He failed to maintain that status and faced deportation proceedings in February, 1983.
 
 
 15
 Ikdeh appeared before an immigration judge, conceding that he was deportable as charged, but he also applied for asylum. In response to questioning by the immigration judge, Ikdeh stated that he was separated from his wife and that he had one child. He stated that he worked in electronics and that he had finished two years of college in this country. He had no relatives in the United States except his son.
 
 
 16
 Petitioner's asylum claim was based on his Sunni Muslim religion. The hearing on the merits of the claim was held on August 1, 1983. Ikdeh testified that he left Syria because he could not find work, because another Muslim sect, being predominant, ran the country. Ikdeh testified in contradiction to his asylum application that he was a Muslim Siminee. After his graduation from school in Syria, the government had wanted to draft him into the army. A friend of his brother, as a favor, had moved his name to the bottom of the list. Ikdeh then applied for his student visa and came to the United States as a student.
 
 
 17
 Ikdeh stated his fear and opinion that if he were returned to Syria he would be put in the army (normal service time in the army would be three and a half years). He also stated that he would be arrested immediately and jailed for two years, because he was a Siminee Muslim[4] and because he had stayed out of the country longer than authorized.
 
 
 18
 He testified that his brother had been arrested after he returned to Syria from his medical education in Egypt; that brother, however, had subsequently been hired by the government and taught at a university. He stated, without elaboration, that he knew many people who had left Syria who would have problems if they returned.
 
 
 19
 On cross-examination petitioner stated that the government in Syria had not changed since he had left. His brother had changed his religion because he wanted to work in the government. Petitioner also stated that he had taken secret action against the government once. He had never sent his school transcripts to Syria but he also claimed that if returned to Syria, his army term would be extended because he had not received a higher education degree. He claimed to be supported by his brother since his father had died.
 
 
 20
 In response to questioning by the immigration judge, Ikdeh indicated that he had never been arrested, interrogated, or imprisoned in Syria. He testified that a brother of his had been arrested, but could not give any reason. His brother had been released and had left the country. One of his sisters was still in Syria and another was in Saudi Arabia. His father had been a factory manager, a religious leader, and worked for the government. Oussama Muhammad Char, a witness for Ikdeh, formerly a Syrian citizen but now a lawful permanent resident of the United States, had known petitioner in Syria. He stated that he had no proof, but he predicted that petitioner would be jailed for three years if he were returned to Syria.
 
 
 21
 On November 15, 1983, without the submission of further evidence which Ikdeh had been invited to submit, the immigration judge issued his decision. Finding petitioner deportable as charged, he also denied his applications for asylum and withholding of deportation, but granted him 30 days to depart voluntarily. The immigration judge found that petitioner had not presented any evidence to support his subjective fears of persecution as a Sunni Muslim. Further, the immigration judge noted that the State Department had determined that the differences between the ruling Shi'ite Moslim sect and the minority Sunni sect would not pose a risk of persecution to an ordinary member of either sect.
 
 
 22
 Petitioner then appealed the immigration judge's decision to the Board, stating that he had been informed that one of his brothers had been killed by Syrian troops, another brother jailed, and that a third brother had previously fled to Saudi Arabia. On May 31, 1985, before the Board issued its decision, petitioner filed a motion to reopen proceedings before the immigration judge, including a letter from his brother in Saudi Arabia advising him not to return because the Syrian government knew his situation and would jail him. Petitioner also submitted evidence that in Damascus, Syria, he had belonged to an organization called "Group Community of Part Communist" which had spoken out against the Syrian government. He stated that he had no doubt he would be killed if he were returned to Syria. Petitioner also submitted various articles regarding the general conditions in Syria with his brief to the Board.
 
 
 23
 The Board upheld the immigration judge's decision and denied petitioner's motion to reopen, holding that at most, petitioner had established that he feared the "turmoil and violence endemic to the region." The Board also found that petitioner's testimony reflected a greater concern over having to serve in the Syrian military than with actual persecution. The Board also concluded that the evidence submitted after the deportation hearing was insufficient to order a reopening of the case (no evidence had been submitted in the twenty months the appeal had been pending to support petitioner's statement on his notice of appeal that his brother had been killed). The Board questioned the reliability of many of Ikdeh's late-raised assertions and found that petitioner's affidavit regarding his political activities was unsupported and thus not prima facie evidence of a likelihood of persecution so as to warrant reopening.
 
 
 24
 All three separate petitions for review to this court followed decisions similar in their import against each petitioner.
 
 
 25
 Denials of a claim for withholding of deportation and for asylum must be reviewed individually and with separate standards. Yousif v. INS, 794 F.2d 236, 243-44 (6th Cir.1986). We review the Board's factual findings underlying its decision to withhold deportation under a substantiality of the evidence standard. Id. at 242; see also Carvajal-Munoz v. I.N.S., 743 F.2d 562, 569 (7th Cir.1984); Wing Ding Chan v. I.N.S., 631 F.2d 978, 980-81 (D.C.Cir.1980), cert. denied, 450 U.S. 921 (1981); 8 U.S.C. Sec. 1105a(4). The denial of the discretionary grant of asylum is reviewed for an abuse of discretion. Yousif, 794 F.2d at 243-44; Dawood-Haio v. INS, 800 F.2d 90 (6th Cir.1986).
 
 I. WITHHOLDING OF DEPORTATION
 
 26
 The Yousif court set forth the standard governing withholding of deportation as follows:
 
 
 27
 Section 243(h) of the Act, 8 U.S.C. Sec. 1253(h), provides in pertinent part:
 
 
 28
 (1) The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.
 
 
 29
 (Emphasis supplied). This statute mandates that deportation be withheld if an alien satisfies the statutory criteria. It is the alien's burden to show an entitlement to withholding of deportation, 8 C.F.R. Sec. 242.17(c), and the alien satisfies this burden only upon showing a "clear probability of persecution" were he returned to his home country. See generally INS v. Stevic, 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). To meet this burden, the alien must establish that it is "more likely than not that [he] would be subject to persecution." Id. at 424....
 
 
 30
 It has long been recognized in our Circuit that an individual may not rely solely on general descriptions of upheaval in his home country to satisfy the clear probability of persecution standard. See Youkhanna v. INS, 749 F.2d 360, 361 (6th Cir.1984). Rather, to establish that "he as an individual will be subject to persecution ... [a]n alien must show that he will be singled out for persecution or some other 'special circumstances' before relief can be granted." Dally v. INS, 744 F.2d 1191, 1195-96 (6th Cir.1984) (original emphasis).
 
 
 31
 Yousif, 794 F.2d at 242.
 
 
 32
 Given these guidelines, we conclude that the Board properly denied Kishmesh and Jundi's claims for withholding of deportation. Kishmesh and Jundi rely principally on their religious beliefs as Chaldean Christians to support their petitions for withholding of deportation. Neither Kishmesh nor Jundi were found to offer any substantial credible evidence that they would be persecuted upon their return for practicing their religious beliefs. The only other basis raised by both petitioners was a fear of punishment by Iraq for remaining outside of the country for an unauthorized extended time. Since that punishment may fall on any Iraqi citizen who stayed away too long, not just a Christian, the governmental action cannot be assumed to be "on account of race, religion, nationality, membership in a particular social group, or political opinion," absent specific credible evidence to the contrary.
 
 
 33
 Ikdeh claimed that he was likely to be persecuted on return to Syria because he was a Sunni Muslim who had remained away from Syria too long. Ikdeh was found to have made unsubstantiated claims that Sunni Moslems had been persecuted on return to Syria. While there Ikdeh had never been arrested or interrogated. He claimed one brother had been arrested, but he did not know why; another brother changed his religious preference to obtain a job with the government. Belatedly, he claimed that a brother was killed by the Syrian army and another one was jailed, but he offered no objective evidence or basis for that knowledge. A letter produced from another brother after the alleged death and imprisonment did not refer to the death or imprisonment; the letter did, however, caution Ikdeh not to return to Syria because the Syrian government knew about his situation and would kill him. The former Syrian witness who testified about probable imprisonment of Ikdeh if forced to return had not lived in Syria for more than a decade.
 
 
 34
 While Ikdeh's situation presents a harder case, we conclude that the Board did not abuse its discretion in refusing to reopen Ikdeh's application for withholding of Ikdeh's deportation. This decision is supported by substantial evidence. As the Board noted, much of Ikdeh's concern centered on avoiding military service if he returned to Syria, which is not a basis on which to grant relief. Ikdeh also focused on generalized turmoil and violence in the region without specific evidence of individualized religious persecution. Ikdeh had never before himself been harassed by the government and the Syrian government also did not know of an act of opposition that Ikdeh committed in secret. As with the two Chaldean Christians, the State Department had concluded that membership in the Sunni Muslim sect was an insufficient basis to warrant withholding of deportation. Ikdeh, moreover, did not make clear the sect to which he belonged. We are not persuaded that we should overrule the Board's determination that Ikdeh was not credible with respect to his evidence about family persecution.
 
 
 35
 In summary, therefore, the Board's determination that Kishmesh, Jundi, and Ikdeh had failed to show an entitlement to withholding of deportation is supported by substantial evidence. As to Ikdeh, the Board did not abuse its discretion in refusing to reopen the deportation proceedings on his claim, although we might have acted differently had we been called upon to consider further Ikdeh's later claims.
 
 II. ASYLUM
 
 36
 Requests for asylum are filed under section 208(a) of the Act, which provides:
 
 
 37
 The Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title.
 
 
 38
 8 U.S.C. Sec. 1158(a).
 
 
 39
 To qualify for a discretionary grant of asylum, therefore, an alien must be a "refugee" as defined in 8 U.S.C. Sec. 1101(a)(42)(A). This definition provides:
 
 
 40
 The term "refugee" means (A) any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion....
 
 
 41
 8 U.S.C. Sec. 1101(a)(42)(A) (emphasis added).
 
 
 42
 Discussing the standard of review governing requests for asylum, the Yousif court stated:
 
 
 43
 The INS asserts that this Circuit has determined that a "well-founded fear of persecution" standard, included in the definition of refugee is precisely the same as the "clear probability of persecution" standard used in section 243(h) claims. The INS relies on Reyes v. INS, 747 F.2d 1045 (6th Cir.1984), vacating 693 F.2d 597 (6th Cir.1982), cert. denied, --- U.S. ----, 105 S.Ct. 2173, 85 L.Ed.2d 491 (1985), which states that the Supreme Court in Stevic "held that an alien seeking asylum must demonstrate a clear probability of persecution." 747 F.2d at 1046 (emphasis added). However, the Court in Stevic concluded its opinion with the following remarks:
 
 
 44
 Today we resolve one of those problems by deciding that the "clear probability of persecution" standard remains applicable to Sec. 243(h) withholding of deportation claims. We do not decide the meaning of the phrase "well-founded fear of persecution" which is applicable by the terms of the Act and regulations to requests for discretionary asylum. That issue is not presented by this case.
 
 
 45
 467 U.S. at 430, 104 S.Ct. at 2501. It is clear from this passage that deciding the meaning of the phrase "well-founded fear of persecution" was expressly reserved by the Court in Stevic. Our reading of Stevic convinces us to follow the cases in our Circuit which recognize this aspect of Stevic, holding that different standards apply to requests under sections 243(h) and 208(a). See, e.g., Youkhanna v. INS, 749 F.2d 360, 362 (6th Cir.1984); Dolores v. INS, 772 F.2d 223, 226 (6th Cir.1985) (per curiam).
 
 
 46
 ....
 
 
 47
 ... The conclusion that the well-founded fear standard is easier to satisfy is logical since an alien requesting asylum merely seeks to be found eligible for a discretionary grant of asylum, rather than claiming entitlement to a withholding of deportation. See Cardoza-Fonseca, 767 F.2d at 1451-52.
 
 Yousif, 794 F.2d at 243-44.[5]
 
 48
 In Yousif petitioner sought asylum based on his "Chaldean Christian background, his absence from Iraq, his criticism of the Baath regime and his application for asylum ... [and on the fact that] he would be drafted into the army [upon return to Iraq]." 794 F.2d at 239. Before the INS examiner, Yousif stated that he belonged to no political organization, had never spoken out against the government, had never been detained, arrested, or interrogated by the government. He further claimed that he was forced to bribe an official to get a passport because of his religion and that his brother had been briefly imprisoned for not studying the Koran. The district director rejected these claims as self-serving and without a factual basis. After Yousif was charged with being a deportable alien, he had a hearing before an immigration judge. Yousif generally repeated his earlier allegation, but added, without explanation, that he had been terrorized in Iraq. He concluded that he would be arrested and tortured upon return to Iraq.
 
 
 49
 The immigration judge rejected Yousif's assertions, finding them unsubstantiated and greatly exaggerated. Yousif's appeals and motions to reconsider also failed despite affidavits from his sister, who resides in the United States, that Yousif and their father had been brutalized for not reading the Koran. In determining that the Board had not abused its discretion in refusing to reopen denial of asylum, the Yousif court found that the petitioner had "failed to present credible evidence to support his claim that he is being singled out for persecution, and he has failed to demonstrate that his fear of being persecuted as a Chaldean Christian is well-founded." Id. at 244.
 
 
 50
 Although Yousif seemed to grant broad deference to INS' refusal to reopen denials of petitions for asylum, a recent opinion would seem to restrict somewhat the exercise of that discretion. See Dawood-Haio v. INS, 800 F.2d 90 (6th Cir.1986). The petitioner sought asylum based on his status as a Chaldean Christian in Iraq. To support that basis for a well-founded fear of persecution, petitioner relied on various allegations of persecution by the Iraqi regime. First Dawood-Haio claimed that his father was imprisoned when he refused to join the ruling party and died of a "heart attack" in prison despite seemingly good health. Second, petitioner asserted that he was jailed for two days by the government in an effort to persuade him to join the Baath party. Additionally, petitioner stated that he had openly criticized the ruling government. Finally, petitioner believed that if required to return to Iraq, he would face "certain arrest, jail, torture, possibly execution."
 
 
 51
 An immigration examiner found Dawood-Haio's claims to be frivolous and undocumented by specific instances of persecution. Throughout the administrative process and after a hearing before an immigration judge, a written decision by the immigration judge denied Dawood-Haio's petition, reasoning:
 
 
 52
 No past history of governmental action against [petitioner] was developed or proved by even a minimal amount of evidence on this record. [Petitioner] was never singled out individually for adverse specialized treatment by any governmental unit or any other groups allegedly a part of the Iraqi government while he resided in Iraq. * * * He entered the United States as a visitor and did not advance his claim until well after his nonimmigrant status had expired.
 
 
 53
 800 F.2d at 94.
 
 
 54
 The Board affirmed the denial, noting that petitioner's accounts of his "arrests" were "vague and speculative." The Board concluded that petitioner had failed to show a well-founded fear of persecution either under the "clear probability" standard used by the district director or under a "good reason" standard or a "realistic likelihood" standard. Subsequently the Board denied petitioner's motion for reconsideration, reasoning that Dawood-Haio had failed to satisfy his burden of establishing refugee status whether it was measured under any of the following standards: "clear probability," "realistic likelihood," a "reasonable possibility" of a "good reason to fear persecution."
 
 
 55
 In remanding this petition for reconsideration by the Board, our court in Dawood-Haio determined that the Board had erred in applying the "clear probability" standard to asylum petitions and "failed to offer any rational explanation of why, if the proper standard had been applied, petitioner would not have been found to be a refugee." 800 F.2d at 96 (emphasis added). The court noted that the Board had not suggested that petitioner was not telling the truth in reciting the religious persecution suffered by his father and himself in Iraq and it cited no inconsistencies or omissions in petitioner's claims. INS thus failed to articulate a rational basis for determining that petitioner was not a refugee and we found an abuse of discretion under the circumstances. Remanding for reconsideration, it was directed that whether or not asylum should be granted should be reviewed again.
 
 
 56
 We are persuaded that in the cases before us the principles and rationale expressed in Yousif should pertain. Unlike Dawood-Haio, there was a question of Ikdeh's credibility, and there were inconsistencies in his claims. Kishmesh and Jundi relied on conclusory claims of potential punishment for remaining outside of the country too long, not on any substantiated claims of persecution for belonging to a particular religious or political group. The INS, therefore, had a substantial basis for denying asylum in each of these cases, regardless of whether the "clear probability" standard or "well-founded fear of persecution" standard was applied.
 
 
 57
 Accordingly we AFFIRM the decision of INS in each of these cases.
 
 
 
 *
 The Honorable James D. Todd, United States District Judge for the Western District of Tennessee, sitting by designation
 
 
 [1]
 By memo dated June 29, 1978, INS granted asylum as a matter of course to Iraqi Christians, reflecting then current views of the State Department's Assistant Secretary for Human Rights and Humanitarian Affairs
 
 
 [2]
 That petition was denied by the district director on February 4, 1986
 
 
 [3]
 Specifically the immigration judge found that the "respondent has failed to satisfy the burden of proof which is his to corroborate and prove outside of his own statements that some serious individualized treatment would be accorded him were he to return to Iraq." (emphasis added)
 
 
 [4]
 At another point in his testimony he again claimed to be a Siminee Muslim
 
 
 [5]
 As the Yousif court noted, the Supreme Court has accepted Cardoza-Fonseca for review. Perhaps the Court will clarify the difficulties manifest in applying the asylum standards