7 F.3d 225
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Okwoukei OKONMAH, Petitioner,
v.
U.S. IMMIGRATION & Naturalization Service, Respondent.
 No. 92-1630.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 1, 1993.
Decided: September 17, 1993.
 
 On Petition for Review of an Order of the Immigration and Naturalization Service.
 ARGUED: Thanos Kanellakos, for Petitioner.
 Stewart Deutsch, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT of Justice, for Respondent.
 ON BRIEF: Stuart M. Gerson, Assistant Attorney General, Richard M. Evans, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT of Justice, for Respondent.
 E.D.Va.
 AFFIRMED
 Before MURNAGHAN and HAMILTON, Circuit Judges, and PAYNE, United States District Court Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 Okwoukei Okonmah ("Okonmah"), seeks review of an order of the Bureau of Immigration Appeals ("BIA") holding that he is not a "refugee" within the meaning of 8 U.S.C. § 110(1)(42)(A) and that therefore he is eligible neither for asylum under 8 U.S.C. § 1158(a) nor to have his deportation withheld under 8 U.S.C. § 1253(h). We affirm.
 
 I.
 
 2
 On May 3, 1989, Okonmah entered the United States as a nonimmigrant business visitor with permission to remain until June 2, 1989. Okonmah stipulated that he had overstayed his visa and that, as a consequence, he was deportable. He sought to establish, however, that he was a refugee and that therefore he should be granted asylum or, alternatively, that his deportation should be withheld.
 
 
 3
 Following a hearing at which Okonmah and two witnesses testified, an immigration judge found that Okonmah was deportable under 8 U.S.C. § 1251(a)(2) as a nonimmigrant who had remained in the United States longer than permitted by law. Finding that Okonmah was not a refugee, the immigration judge denied Okonmah's request for asylum and his alternate request for withholding of deportation. On appeal, the BIA affirmed these determinations.
 
 
 4
 To establish that he was a refugee Okonmah was obligated to prove that he was unable or unwilling to return to, or to avail himself of the protection of, his native Nigeria "because of persecution or a wellfounded fear of persecution on account of ... membership in a particular social group, or political opinion." See 8 U.S.C. § 1101(a)(42)(A). Okonmah claims that he fears persecution for political reasons which have their genesis in an April 15, 1989, meeting of the Alumni Association of the University of Nigeria, Lagos, from which Okonmah claims to have graduated in 1987. According to Okonmah, he was a member of the Alumni Association and the secretary of the Correspondence and Open Studies Institute ("COSI") at the university. During the April 15, 1989 meeting, Okonmah and nine other individuals purportedly wrote a letter to the military government of Nigeria urging it to step down and hold democratic elections (the "April 15 letter"). Five of the signatories, including Okonmah, were members of the Alumni Association, and five were students then enrolled in the university. Okonmah testified that he was unsure of the date that this letter was mailed to the military government, and that he could only identify by name three of the other nine signatories.
 
 
 5
 On May 3, 1989, Okonmah travelled to the United States on a business visa which he had received before he signed the April 15 letter. Very shortly after his arrival in the United States, Okonmah claims to have received several alarming phone calls from Nigeria. None of the callers testified at the hearing, but Okonmah testified that one of them, Les Godwin, informed him that five members of the Alumni Association had been arrested and that, as a result of the arrests, students throughout Nigeria had participated in a strike and several students had been killed by the police. Godwin allegedly warned Okonmah that he would be arrested if he returned to Nigeria because he had signed the April 15 letter and because he was a member of the Movement for the Restoration of Democracy, an organization not further identified in the record.
 
 
 6
 Okonmah also testified that his wife was arrested in December 1990; that she was released; and that she then was fired from her teaching job at the university because of her political beliefs. At the time of his deportation hearing, Okonmah was unaware of the whereabouts of his wife, but he suspected that she was in hiding.
 
 
 7
 Bernard Akinsia ("Akinsia"), one of Okonmah's witnesses testified that when he visited Nigeria on June 4, 1989 the universities were closed because of rioting. Akinsia questioned his brother, Billy, who was a student at the University of Nigeria, about the riots and during that conversation:
 
 
 8
 [Okonmah's name] came up because they [Okonmah and Billy Akinsia] were both attending the university of Lagos and they were both in the student government consulate association that has written a letter to the federal government protesting their military rule that resulted in the student riots.
 
 
 9
 Billy Akinsia provided his brother, Bernard, with Okonmah's telephone number in the United States and asked Bernard to warn Okonmah not to come back to Nigeria "because they were looking for him." According to Bernard Akinsia, his brother also explained that the government was seeking Okonmah because he had signed a letter which had precipitated student riots, and which in turn had led to student deaths and the closing of universities in Nigeria.
 
 
 10
 Akinsia explained that he feared for the safety of his brother and thus took him to Ghana. When Akinsia returned to the United States in July 1989, he telephoned Okonmah and told him"about what happened in Nigeria, and that his lift [sic] is in danger, he should not make any attempt to come to Nigeria at this time."
 
 
 11
 Okonmah's other witness was Robert Onorche ("Onorche"), who met Okonmah in Nigeria before moving to the United States in 1988 and who served as Okonmah's host when Okonmah came to the United States on May 3, 1989. According to Onorche, approximately three weeks after Okonmah's arrival, Okonmah received a telephone call from Nigeria at three o'clock in the morning and which made Okonmah quite "unhappy." Okonmah received two subsequent calls and Onorche pressed him for details:
 
 
 12
 A. So, I asked him what was going on. And then he told me he is being sought for back home in Nigeria.
 
 
 13
 Q. Sought for what?
 
 
 14
 A. The police are looking for him back home in Nigeria. That's what the person who calls told him on the phone. And, I asked him what for. He said, the student body wrote a letter to the government for the government to step down and he was a signature to that letter and all those who wrote the letter they are looking for them to arrest them. So, he was one of them.
 
 
 15
 Onorche subsequently returned to Nigeria and attempted to investigate what Okonmah had told him, but no one would talk to Onorche, apparently believing that he was part of the military government. (Id.). Onorche reportedly met with Les Godwin who said to tell Okonmah not to return to Nigeria "because they are looking for him. And that ... two students who signed the letter had been arrested. So, when I came back I told him...." (J.A. at 86). Onorche also testified that he had read newspaper articles reporting the flight to Cameroon or Ghana of other students involved with the Alumni Association.
 
 
 16
 Like the Immigration Judge, the BIA was persuaded that Okonmah's testimony was internally inconsistent respecting the key events, including the preparation and execution of the April 15 letter, upon which Okonmah's alleged fear of persecution centered. Both also found that Okonmah's written application either contradicted his testimony or failed to corroborate it in significant ways. Finally, both concluded that the testimony of Akinsia and Onorche also conflicted with that of Okonmah and failed to corroborate important segments of Okonmah's version of key facts and events.
 
 
 17
 For example, the Immigration Judge and the BIA found significant conflict in the evidence respecting the date of Okonmah's supposed graduation from the university which tended to shed doubt not only on Okonmah's credibility, but on the credibility of Onorche and Akinsia. 1 The Immigration Judge further found that the evidence did not corroborate Okonmah's claimed membership in the Alumni Association or support Okonmah's testimony that he had signed the April 15 letter. The Immigration Judge considered the failure to produce a copy of the April 15 letter to be a serious deficiency in Okonmah's proof, and he was substantially influenced by the fact that the official United States Department of State reports on human rights in Nigeria mentioned neither the Alumni Association nor the Movement for the Restoration of Democracy as organizations whose members were subject to persecution for their beliefs.
 
 
 18
 The BIA agreed with the deficiencies identified by the Immigration Judge and, in addition, noted that the record was vague and ambiguous respecting the preparation, delivery or existence of the April 15 letter. The BIA also found that further doubt was cast on Okonmah's case by the fact that his application for asylum mentioned neither the April 15 letter nor the warning telephone calls he claimed to have received while staying at Onorche's apartment.
 
 
 19
 To the extent that Okonmah's claimed fear of persecution focused on general conditions in Nigeria, such as suppression of or aggression toward students or dissenters, the Immigration Judge and the BIA again found the evidence lacking. In particular, the BIA found it significant that Okonmah had even failed to prove the existence of the student or alumni group in which he claimed membership or to offer objective evidence of generalized violence against students in Nigeria such as that reported in the hearsay testimony submitted by Akinsia and Onorche on that subject. These defects were considered fatal when considered with the fact that the Country Reports prepared by the Department of State did not corroborate the theory of generalized student oppression in Nigeria.
 
 
 20
 Having determined that Okonmah had failed to prove that he was a refugee who was entitled to asylum, the BIA went on to conclude that Okonmah had failed to meet the more stringent burden of showing, by a clear probability that his deportation should be withheld.
 
 II.
 
 21
 A decision whether to grant or deny asylum under 8 U.S.C. § 1158(a) involves a two stage process, each stage of which is subject to a different standard of review. The determination whether the alien is a refugee as defined by 8 U.S.C. § 1101(a)(42)(A) is reviewed under the substantial evidence standard. Cruz-Lopez v. INS, 802 F.2d 1518, 1519 n.1 (4th Cir. 1986). To establish refugee status, the alien must prove an actual or well-founded fear of persecution on account of one of several factors, including political opinion or membership in a particular social group. See, 8 U.S.C. 1101(a)(42)(A). Then, if the alien establishes statutory eligibility as a refugee, the administrative decision whether to grant or deny asylum is reviewed for abuse of discretion. See Tarvand v. INS, 937 F.2d 973, 976 (4th Cir. 1991); Cruz-
 
 
 22
 Lopez v. INS, 802 F.2d at 1519 n. 1. "The BIA's determination that [an alien] was not eligible for asylum must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole,' " and may be reversed only if the evidence was such that "a reasonable factfinder would have to conclude that the requisite fear of persecution existed." INS v. Elias-Zacarias, U.S., 112 S.Ct. 812, 815 (1992).
 
 
 23
 There is no bright-line test for determining whether an alien has a well-founded fear of persecution because "there is obviously some ambiguity [in the term] which can only be given concrete meaning through a process of case-by-case adjudication." INS v. CardozaFonseca, 480 U.S. 421, 448 (1987). Moreover,"the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program." Id.
 
 
 24
 In INS v. Cardoza-Fonseca, the Supreme Court recognized the need to base the determination of refugee status in part on the subjective mental state of the alien. Id. at 430. Accord M.A. A26851062 v. INS, 899 F.2d 304, 311 (4th Cir. 1990) ("The term 'well founded fear' requires examination of both the subjective fears of the applicant and objective reasons for the applicant's fear."). The Court also attempted to clarify what kind of fear rises to the level of a"well founded fear." Comparing the requirements of the Immigration and Naturalization Act to the 1967 United Nations Protocol Relating to the Status of Refugees, which defines "refugee" almost identically, the Court held that:
 
 
 25
 The [United Nations] standard, as it has been understood by those who drafted it, as well as those drafting the documents that adopted it, certainly does not require an alien to show that it is more likely than not that he will be persecuted in order to be classified as a "refugee."
 
 
 
 *
 
 **
 
 
 
 26
 There is simply no room in the United Nations' definition for concluding that because an applicant only has a 10% chance of being shot, tortured, or otherwise persecuted, that he or she has no "well founded fear" of the event happening.
 
 
 27
 Id. at pp. 436-441. The Court concluded that"a moderate interpretation of the 'well-founded fear' standard would indicate 'that so long as an objective situation is established by the evidence, it need not be shown that the situation will probably result in persecution, but it is enough to show that persecution is a reasonable possibility.' " Id. at 440 (citing INS v. Stevic, 467 U.S. 407, 424-425(1984)). This standard has evolved, in cases following Cardoza-Fonseca, into a test which holds that an applicant for asylum has established a wellfounded fear of persecution if he makes a showing that a reasonable person in his circumstances would fear persecution. See, e.g., Bastanipour v. INS, 980 F.2d 1129, 1133 (7th Cir. 1992); Tarvand v. INS, 937 F.2d at 977. Finally, to establish a well-founded fear an alien "must set forth specific, concrete facts." M.A. A26851062 v. INS, 899 F.2d at 311.
 
 III.
 
 28
 Applying these legal principles to this record, we find substantial evidence to support the BIA's determination that Okonmah failed to establish a well-founded fear of persecution. Viewed as a whole, the evidence presented by Okonmah was vague, contradictory, and, in some instances, not credible.
 
 
 29
 First, the evidence did not establish Okonmah's membership in a group known as the "Alumni Association of the University of Nigeria, Lagos." In fact, if taken as true, the testimony of Onorche and Akinsia that Okonmah did not graduate from the University of Nigeria until 1989 would tend to establish that Okonmah was a student at the time the April 15 letter was allegedly written. This defect is notable because the cornerstone of Okonmah's fear of persecution was his alleged membership in the Alumni Association and the political opinions expressed in the April 15 letter authored under its auspices. Nor does the evidence establish the existence of, or Okonmah's membership in, the "Movement for the Restoration of Democracy." Hence, even if we assume that the "Movement for the Restoration of Democracy" and the Alumni Association are the same organization, the defect remains. Moreover, the 1990 Country Report prepared for Nigeria by the Department of State did not mention either organization in its listing of organizations which had been the target of government persecution.[2]
 
 
 30
 Second, in light of the weight attributed by Okonmah and his witnesses to the April 15 letter, it is important, as the Immigration Judge and the BIA both found, that Okonmah's evidence did not establish when or how the April 15 letter was delivered to the government and that Okonmah did not explain its text except in the most general terms. It is also significant that Okonmah was able to identify only three of the nine other signatories of the letter. And, although the lack of corroborative documentary evidence is not necessarily fatal to an application for asylum considering the difficulties often encountered in obtaining such evidence, see Matter of Mogharrabi, 19 I & N Dec. 1987(BIA), it is suspect that neither Okonmah nor his witnesses could produce a copy of the letter, copies of articles which referred to it or the rioting at the University, or summarize its contents in any detail. These deficiencies are especially significant where, as here, Okonmah's original application for asylum neglected even to mention the April 15 letter.
 
 
 31
 Finally, although we previously have recognized that"familial persecution" is a factor to be weighed in determining whether the record supports the alien's fear of persecution, see Cruz-Lopez v. INS, 802 F.2d 1518, 1522 (4th Cir. 1986) (emphasis added), Okonmah's testimony respecting the persecution of his wife was vague and was not corroborated by objective evidence. No specific details were offered to explain the reasons for her alleged arrest, the length of her alleged confinement, or her subsequent release. Furthermore, there was no specific or concrete evidence linking her alleged persecution to that which Okonmah claims to apprehend, and, in any event, the fact that she was released from confinement argues against a valid claim of familial persecution.
 
 
 32
 We note with some concern that neither the Immigration Judge nor the BIA discussed Bernard Akinsia's testimony that he moved his brother Billy, one of the alleged signatories of the April 15 letter, to
 
 
 33
 Ghana because of fear for his brother's safety. This testimony was corroborated to a certain extent by Onorche's testimony about articles describing the flight of students to Ghana and Cameroon. However, even after taking that evidence into consideration, we are satisfied that substantial evidence supports the BIA's determination that Okonmah failed to show that a reasonable person would have a wellfounded fear of persecution.
 
 
 34
 Because we are satisfied that the BIA correctly determined that Okonmah failed to establish refugee status, it is not necessary to review the discretionary decision to deny him asylum. Nor is it necessary to review the BIA's determination that Okonmah's evidence did not satisfy the higher standard for proving entitlement to withholding of deportation.
 
 
 35
 For the foregoing reasons the order of the Board of Immigration Appeals is
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 In this regard, although Okonmah testified that he graduated in 1987, Akinsia and Onorche both testified that Okonmah did not graduate until 1989
 
 
 [2]
 The only student group mentioned by name as the target of persecution in the Country Report for Nigeria was the National Association of Nigerian Students, which had been banned for radical activities